**Belinda VALDEZ and Jorge Torres, Plaintiffs,**

v.

**CHURCH'S FRIED CHICKEN, INC., Marcial Leal, Individually, Jerry Estrada, Individually, Abel Salazar, Individually, and Jerry Bailey, Individually, Defendants.**

**Civ. A. No. SA–86–CA–262.**

United States District Court, W.D. Texas, San Antonio Division.

March 30, 1988.

598

600

Peter Torres, San Antonio, Tex., for plaintiff Belinda Valdez.

Warren Weir, Weir & Alvarado, San Antonio, Tex., for plaintiff Jorge Torres.

Larry Macon and Jesse Castillo, Cox & Smith, Inc., San Antonio, Tex., for defendants Church's Fried Chicken, Abel Salazar, Jerry Bailey, and Marcial Leal.

George Brin, Brin & Brin, San Antonio, Tex., for defendant Jerry Estrada.

## MEMORANDUM ORDER

PRADO, District Judge.

This lawsuit presents bizarre and troubling problems to the Court, both factually and legally. The evidence adduced at trial included allegations of surreptitious recording of conversations, false written statements created by a party plaintiff and signed as the statement of an impartial witness, a vicious child custody battle where the bargaining chips were continued participation in the lawsuit for an award of custody, and allegations of sexual harassment and a cover-up by top management officials at Church's Fried Chicken. In addition, the lawyers representing the parties got involved in the mud slinging. Numerous motions for sanctions were filed by the Defendants, including one raised during the trial itself, and heated charges and counter-charges of dishonesty occurred during the course of the trial. A final factor complicating the trial was conflict of interest problems on both sides of the lawsuit which necessitated the 11th hour withdrawal and substitution of attorneys.[1]

Despite this heated skirmishing the case proceeded to trial on November 30, 1987 and was concluded December 7, 1987. This memorandum opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

On its face, the case tried seems simple enough. The two remaining party plaintiffs,[2] Belinda Valdez and Jorge Torres, bring suit pursuant to Title VII for sexual harassment and wrongful termination, along with various pendent state law claims, against Church's Fried Chicken as a corporation, and Jerry Bailey, Jerry Estrada, Abel Salazar and Marcial Leal individually. For purposes of clarity the Court will address the claims of each Plaintiff in order.

## I. CLAIMS OF BELINDA VALDEZ

### A. Retaliation Under 42 U.S.C. § 2000e–3

In the Agreed Pretrial Order filed November 18, 1987, Plaintiff claims she was terminated for filing a charge with the Equal Employment Opportunity Commission. This claim was abandoned by Plaintiff at the trial's commencement. Defendant Church's Fried Chicken has filed a separate motion seeking sanctions under Rule 11 of the Federal Rules of Civil Procedure for Plaintiff's failure to drop this logically impossible[3] claim at an earlier time. The Court will address this request for sanctions by separate order.

### B. State Law Assault
#### 1. Liability of Jerry Estrada

■ Although the allegations in the Pretrial Order are not nearly as clear as they should be, Defendants were on notice that the same alleged conduct which gives rise

---

1. Defendants vigorously pursued a continuance because of the recent substitution of counsel in November of 1987 and late discovery problems, but this Court denied the motions by order of November 18 and 19, 1987 (Clerk's Docket Entries # 149, 153).

2. The original complaint included two additional plaintiffs and two additional defendants, but these parties were dropped by agreement of counsel. The plaintiffs dropped from the feder-

al suit, in addition to the federal plaintiffs remaining, have a suit pending in state court against these defendants, and two of them, Janell Torres and Rosalie Garcia, testified on behalf of plaintiffs here.

3. Belinda Valdez was terminated by Church's several months before her *anonymous* claim was filed with the EEOC.

to the sexual harassment claim under Title VII is also the basis for Plaintiff's state law assault claim against Jerry Estrada individually. Defendant Church's strenuously objects to Plaintiff's presentation of the assault claim at trial on the grounds that this claim was not specifically raised in Plaintiff's Fourth Amended Complaint or in the Pretrial Order. Defendant's cite *Mapco, Inc. v. Pioneer Corp.*, 447 F.Supp. 143 (N.D.Tex.), *aff'd*, 615 F.2d 297 (5th Cir. 1978), for the proposition that failure to include a claim in any of the pleadings or in the Pretrial Order mandates a denial of the claim. While there is mandatory language in the opinion, the *Mapco* case relies principally on *Marble v. Batten & Co.*, 36 F.R.D. 693 (D.D.C.1964). In *Marble*, the court denied amendment of the pretrial order at trial and stated that "[i]t is only in the exceptional case that the pretrial order may be amended after the trial has begun." *Id.* at 695. Despite this almost compulsory language, the rationale for *Marble's* holding is that Rule 16 is designed to prevent prejudice to the defendant because of lack of notice or unfair surprise. Rule 16(e) of the Federal Rules of Civil Procedure provides in part that "[t]he order following a final pretrial conference shall be modified only to prevent manifest injustice." The decision to allow any modification of the final pretrial order is within the sound discretion of the district court. *E.g., Allen v. United States Steel Corp.*, 665 F.2d 689, 696 (5th Cir.1982) (decision to strike claim not abuse of discretion).

■ In this case there can be no serious argument that Defendants did not have notice of the gravaman of Plaintiff's state law assault claim or were unfairly suprised at trial. Although Plaintiff failed to specifically plead the claim and may still be subject to sanctions under Rule 16(f), the factual allegations which support Plaintiff's Title VII claim are identical to the facts supporting the assault claim.[4] The Court finds that Defendants' readiness at trial to controvert the factual allegations of the Title VII claim meant they were also prepared to defend against the assault claim. Furthermore, before the trial commenced, the Court advised the Defendants that it would allow them to re-open the record should they believe any trial amendments to Plaintiff's claims caught them by surprise. None of the Defendants have taken advantage of this offer. In terms of the legal issues presented by the assault claim, which are different from the Title VII claim, the Court has invited the parties to submit extensive post-trial briefing on a variety of issues and the parties have done so. In this case there can be no finding of unfair surprise or lack of notice of the assault claim. All of the cases cited by Defendant Church's are distinguishable in that they do not involve attempts to add amended claims which have the identical factual underpinning to claims properly raised in the pleadings and the pretrial order. *See also, Daniels v. Board of Education of Ravenna City School District*, 805 F.2d 203, 210 (6th Cir.1986) (disparate impact claim not allowed where case tried on disparate treatment theory). The Court finds that it would be manifestly unjust to jettison half of Plaintiff's case for the failure of her attorney to properly plead the assault claim.

■ Plaintiff was employed by Church's Fried Chicken from December 31, 1984 until March 22, 1985, at Store # 606, Church's downtown location on Houston Street.

Defendant Jerry Estrada was employed during this time period as "team leader." The Court finds that Jerry Estrada worked 3–4 nights each week when no managers were present and that Belinda Valdez was often working during this shift. Although Plaintiff testified at trial that Defendant Estrada was an assistant manager and fired her from her job as a "team member" at Store # 606, the Court does not find this testimony to be credible. No other witness

---

**4.** Plaintiff summarizes her claims in the Pretrial Order by stating "Belinda Valdez was subjected to sexual contact and suggestions of involvement of [sic] sex acts. More specifically, Defendant manager Jerry Estrada pulled her pants down in the restroom and exposed his genitals to her and attempted to have sexual intercourse with her without her consent and over her protest ..." Agreed Pretrial Order at 5.

corroborated Plaintiff's testimony that Jerry Estrada was actually an assistant manager at any time or held himself out to be an assistant manager by wearing a manager's badge.

Under Texas law, a defendant is guilty of civil and criminal assault when he "intentionally or knowingly causes physical contact with another when he knows or should reasonably believe that the other will regard the contact as offensive or provocative." *Moore's Inc. v. Garcia*, 604 S.W.2d 261, 264 (Tex.Civ.App.–Corpus Christi 1980), writ ref. n.r.e.; *Vietnamese Fisherman's Association v. Knights of Ku Klux Klan*, 518 F.Supp. 993 (S.D.Tex.1981).

In the Pretrial Order, Plaintiff alleges that "Jerry Estrada pulled her pants down in the restroom and exposed his genitals to her and attempted to have sexual intercourse with her without her consent and over her protest." Agreed Pretrial Order at 5. If true, these allegations quite obviously constitute an assault under Texas law.

One of the many difficulties the Court faces in reaching a decision in this case is sorting our diametrically conflicting testimony from interested witnesses. The court in *Heelan v. Johns–Manville Corp.*, 451 F.Supp. 1382, 1385 (D.Colo.1978) was faced with similar difficulties in evaluating conflicting testimony. This Court has also considered as many relevant factors as possible in making its credibility determinations, including a witness' motive, memory, and demeanor on the witness stand.[5] This Court has carefully weighed the testimony of all witnesses in attempting to reconstruct the relevant events which occurred at Store # 606 in 1985.

Credibility determinations in this case are made even more difficult by the fact that some witnesses are worthy of belief on some issues and completely incredible on others. This problem is particularly acute when assessing the testimony of Belinda Valdez.

At trial it was evident to the Court that Belinda Valdez lied about several critical facts. Defendant's counsel, Mr. George Brin, established to the Court's satisfaction that Defendant's Exhibit LL, which purports to be a statement from an impartial party who witnessed Jerry Estrada sexually harass Belinda Valdez at Store # 606, is actually a forgery done in Plaintiff's own hand. Furthermore, two witnesses, Bertha Chapko and Rebecca Martinez, testified that Plaintiff approached them while they were staying at the Bexar County Women's Shelter and asked them to sign false statements accusing Jerry Estrada of sexual harassment. Although Plaintiff continued to deny at trial that she solicited false statements against Defendant Estrada, the Court finds the testimony of Chapko and Martinez to be credible. The motive for Plaintiff's solicitations, according to Ms. Martinez, was that Plaintiff needed corroborating witness statements before her lawyer would agree to take her case.

Defendant Estrada's counsel suggests that the Court find Plaintiff's testimony to be unworthy of belief in all respects because it was revealed as obviously untruthful in some respects. This solution to the credibility problem is tempting, but the Court finds that the truth in this case is colored in shadings of gray rather than in stark relief. Although some of the details

---

**5.** In arriving at its credibility determination, the *Heelan* court observed:

"much of the testimony is conflicting, not only in pivotal areas, but in areas of marginal relevance as well. This case is based largely upon the court's view of the credibility of the witnesses, i.e., their worthiness of belief.

We have carefully scrutinized all testimony and the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief. For example, we have taken into account each witness' motive and state of mind, strength of memory, and demeanor and manner while on the witness stand. We have considered factors which affect the witness' recollection and his or her opportunity to observe and accurately relate to the matters discussed. We have considered whether a witness' testimony has been contradicted, and the bias, prejudice, and interest, if any, of each witness. In addition, we have considered any relation each witness may bear to either side of the case; the manner in which each witness might be affected by a decision in the case; and the extent to which, if at all, each witness is either supported or contradicted by other evidence." *Id.*

concerning the alleged assaultive conduct may be unclear the Court finds that an assault was committed by Defendant Jerry Estrada against Belinda Valdez.

Against this backdrop the Court will now consider the specifics of the alleged assaults. At trial, Belinda Valdez testified about three "serious" incidents involving Jerry Estrada. The first occurred approximately one month after Plaintiff began working for Church's on the last day of December, 1984. Before this first incident of physical contact, Plaintiff testified that on the very first day of her job, Defendant Estrada approached her, told her she was pretty, that he wanted to "have her," and asked her out on a date. Plaintiff refused Defendant's invitation. Although Jerry Estrada does not specifically deny this account, he categorically denies that he was romantically interested in Belinda Valdez or that he physically approached her in any manner. Estrada further testified that another employee at Store # 606 told him that Plaintiff had a crush on him and that he didn't want her "to fall for me." Defendant also testified that Plaintiff's account of the assaults is not plausible because he was happily married to his wife at the time.

The Court finds Plaintiff's testimony to be credible regarding what transpired on her first day of work. Although Plaintiff and Defendant may not have been on the same shift for a long period of time on December 31st, and Plaintiff made no notation of the incident in her personal journal,[6] Plaintiff's account of the incident is consistent with Jerry Estrada's pattern of behavior. Vicki Vasquez, one of the few completely credible witnesses who testified at trial, stated that on her very first day of work Jerry Estrada asked her to walk across the street with him and give him a kiss. Although Ms. Vasquez was only 16 years old at the time, she rebuffed Defendant Estrada's amorous advances and warned him that she would report him to the store manager, Abel Salazar, if Estrada tried anything again. Notwithstanding this rebuke, Estrada did in fact approach Ms. Vasquez on two later occasions. In the second incident, Ms. Vasquez asked Jerry Estrada to help her study for an employment related test. In response, Estrada asked Ms. Vasquez what she would do for him. Ms. Vasquez understood Defendant Estrada's question to be a romantic or sexual insinuation. The third incident occurred when Ms. Vasquez was in the back of the store and reaching up to get a can from a shelf. Estrada approached her from behind, put both hands on her waist and hugged her. Ms. Vasquez also successfully repelled this clumsy advance.

Other Church's employees testified that Jerry Estrada was "constantly hugging the girls." Jesse Oliveras testified that Estrada would often tell female employees under his supervision to perform some chore in the back of the store and then follow them and hug them, sometimes staying for five minutes. Although some of these advances may have constituted flirtation, rather than actionable sexual harassment, and may have been welcomed,[7] they at least serve to thoroughly impeach the credibility of Jerry Estrada in the Court's view. Defendant Estrada admitted that he hugged his female co-employees at Church's "most of the time," but claimed his hugs were only friendly in nature and that he treated his male co-employees in the same manner. This testimony is not credible. Other witnesses testified that Estrada singled out female employees for this

---

**6.** Defendant's Exhibit KK is a contemporaneous journal entry of Plaintiff's, apparently purloined by her ex-husband Adam Valdez and provided to the defense. The Court does not find it remarkable or indicative of fabrication that Plaintiff did not mention this incident in her journal. There was evidence presented that Church's time records indicate that Jerry Estrada's and Belinda Valdez's shifts only overlapped by less then 30 minutes on December 31st. Not-

withstanding this short overlap, the Court finds that the incident did occur.

**7.** The Court in no way means to condone the conduct of Defendant Estrada, even if it does not constitute actionable sexual harassment. As the Supreme Court made clear in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49, not all offensive contact or behavior is cognizable under Title VII.

"friendly" treatment, and notwithstanding Defendant's protestations that he was happily married, the Court finds that Jerry Estrada improperly attempted to use his position as team leader to his advantage.

The Court does not believe it necessary to detail the three incidents alleged by Plaintiff. Briefly summarized, on the first occasion, Plaintiff and Defendant were alone in a backroom when Defendant approached Plaintiff from behind and rubbed up against her and fondled her breasts. On the second occasion, Jerry Estrada asked Belinda Valdez to come into the back office to discuss her job evaluation. Estrada told Valdez that she could become a team leader if she was nice to him, pulled out his penis and attempted to force Plaintiff to engage in oral copulation. On the third occasion, Defendant Estrada came into the restroom while Plaintiff was cleaning. Estrada pushed Plaintiff against the wall, pulled down her pants, and attempted to have sexual intercourse with Plaintiff. Plaintiff resisted and because she crossed her legs, Defendant was only able to achieve partial penetration.

The accounts given by Plaintiff of these three incidents in her deposition and her trial testimony are not completely consistent. Many of the details of the three incidents are scrambled in Plaintiff's mind, by her own admission, and she testified that she tries to forget what happened. For example, Plaintiff's testimony regarding the time these three incidents occurred is not consistent. Dr. Francisco Rodriguez testified that it is common for victims of post-traumatic stress syndrome not to remember and recount details of the stressful event. Defense counsel attempts to make much of these inconsistencies of detail, with the obvious implication that all three incidents have been entirely fabricated by Belinda Valdez. Despite these inconsistencies, the Court finds that Belinda Valdez was sexually assaulted by Jerry Estrada at least once and that Estrada's advances were unwelcome. Defendant Estrada does not claim that any of the physical contact was consensual—he categorically denies that any of it ever occurred.

The Court's finding that Plaintiff was sexually assaulted is bolstered by the testimony of Dr. Francisco Rodriguez, a treating psychiatrist, and Ms. Lois Healy, Plaintiff's clinical social worker. Dr. Rodriguez saw Plaintiff three or four times on an emergency basis. Dr. Rodriguez diagnosed Belinda Valdez's condition as post-traumatic stress disorder—chronic. Dr. Rodriguez testified that this condition is a rigid diagnostic criteria and identified seven symptoms of the disorder—all of which were present in Belinda Valdez. In Dr. Rodriguez's medical opinion, Plaintiff's condition was caused by a series of incidents at Church's Fried Chicken which culminated in an attempted rape by Jerry Estrada. Dr. Rodriguez further indicated that he had a 70–80% confidence level in the truthfulness of Plaintiff's account. Dr. Rodriguez also testified that Plaintiff's case history included feelings of being ashamed and reports of showering two to three times daily, a common behavioral trait of rape victims.

Ms. Healy met Plaintiff through her church and has been providing counseling to Plaintiff once or twice each week for the last year and a half. Ms. Healy testified that her sessions with Plaintiff were marked by crying, apprehension, fear of men, and accounts of nightmares, and feelings of shame. Ms. Healy originally began consulting Plaintiff with her husband, in an effort to work out their difficulties after their divorce. Ms. Healy indicated that both Plaintiff and her ex-husband attempted to avoid talking about what happened at Church's Fried Chicken and were ashamed of the incidents. Ms. Healy's "social worker diagnosis" of Plaintiff's condition was severe anxiety and depression. Although Ms. Healy prefaced her opinion with the caveat that she could never be certain if a client was being truthful, she stated that she believed Plaintiff's account of the incidents at Church's Fried Chicken.

Defendants did not offer any clinical or psychiatric testimony to controvert the testimony of Plaintiff's two expert witnesses. They did, however, attempt to impeach the testimony of both Dr. Rodriguez and Ms. Healy by adducing that neither clinician

performed any psychological tests to establish Belinda Valdez's truthfulness. They further attempted to impeach Dr. Rodriguez by showing that he did not delve into Plaintiff's childhood or previous sexual experiences. Dr. Rodriguez countered this attempt to impeach his testimony by stating that the recommended treatment of patients suffering from post-traumatic stress syndrome avoids thorough exploration of the patients' trauma because these patients are usually quite reluctant to reveal details of their experiences. Defendants offered no testimony that the post traumatic stress syndrome Dr. Rodriguez diagnosed could have been caused by ongoing marital difficulties and domestic assaults.

Belinda Valdez's performance on the witness stand revealed her to be an unsophisticated liar. Her attempts to forge witness statements and manufacture favorable testimony were transparently ineffective. Ironically, Plaintiff's inconsistent testimony in these areas lends more credibility to her testimony on the ultimate issue—whether an assault in fact occurred. For the Court to accept Defendants' position, it would have to conclude that no physical contact ever occurred between Jerry Estrada and Belinda Valdez and her account of the incidents was a complete fabrication. Furthermore, the Court would have to believe Plaintiff was sophisticated enough to effectively fabricate the seven symptoms outlined in Dr. Rodriguez's post traumatic stress disorder diagnosis, and such details as nightmares and taking showers two to three times daily. Quite simply, the Court finds that Plaintiff is not sophisticated enough to fabricate these details and completely buffalo three clinical experts, including two medical doctors. For all the foregoing reasons, the Court finds that Defendant Jerry Estrada did sexually assault the Plaintiff on at least one occasion. The details may be confused in Plaintiff's recollection, but the Court finds that Defendant Estrada did assault Belinda Valdez.

Something must be said, however, about the many disturbing fabrications and inconsistencies in Plaintiff's testimony. Three witnesses, Rebecca Valdez, Bertha Chapko, and Rebecca Martinez, testified that Plaintiff approached them to solicit false statements about Jerry Estrada assaulting her. There was some indication in the testimony that Adam Valdez and Bernie Castillo may have been similarly solicited.[8] Further testimony revealed that the Plaintiff, although she fervently denied it, was willing to trade custody of her children for her husband's cooperation in prosecuting this lawsuit. In short, Plaintiff was willing to go to incredible lengths to manufacture favorable testimony.

That Plaintiff did fabricate some testimony and was willing to do a lot more to aid her case does not mean that the assault never occurred, however. One of Defendants' witnesses, Bertha Chapko, testified that when Plaintiff approached her with the request to give false testimony, Plaintiff explained that she needed witness statements corroborating her story before her lawyer, Mr. Patrick Stolmeier, would accept her case. The Court finds that Belinda Valdez did fabricate some testimony and attempt to solicit additional false testimony. The Court finds, however, that the reasons for this unconscionable conduct were not that the assault itself was also a fabrication, but that Plaintiff was overzealous in her attempts to get an attorney to take her case and in her attempts to prevail on the merits at trial. Under these circumstances, it is difficult for the Court to accept any of Plaintiff's testimony, and even more difficult to rule in Plaintiff's favor, but after reviewing all of the conflicting testimony and evaluating the circumstances of this case, the Court concludes that

---

**8.** Plaintiff admitted that Adam Valdez, during his second deposition, recanted prior testimony about witnessing Jerry Estrada assault her and that Plaintiff had solicited his false testimony. The Court can reach no conclusion about the testimony of Bernie Castillo, a friend and co-worker at Church's. Castillo testified that he walked into the restroom several times and witnessed Jerry Estrada forcing himself on Belinda Valdez. This witness's inability to effectively communicate and several implausible details he provided requires the Court to discount his testimony entirely.

Defendant Jerry Estrada is liable for assault under Texas law.

### 2. Liability of Church's Fried Chicken

#### a) Liability for actual damages

■ The general rule in Texas is that liability of a corporation for the assault of its employees cannot attach unless the assault was in furtherance of the corporation's business. *Tierra Drilling Corp. v. Detmar,* 666 S.W.2d 661, 663 (Tex.App.–Corpus Christi 1984). In some situations an employee such as a bouncer may be authorized to use force, but in this case there was no testimony that Church's Fried Chicken authorized Jerry Estrada to use any force in the performance of his duties. As a matter of common sense, cooking and serving fried chicken is not the type of employment which requires any use of force.

Assaults on third parties are generally considered to be expressions of personal animosity and outside the scope of a servant's authority. *Green v. Jackson,* 674 S.W.2d 395, 398 (Tex.App.–Amarillo 1984, *writ. ref'd n.r.e*). Even under the more liberal line of Texas cases, liability will not attach against the employer unless "the act complainted of arose directly out of and was done in the prosecution of the business that the servant was employed to do." *Id.* In this case there can be no question that the sexual assault Jerry Estrada committed on Belinda Valdez was purely personal and had nothing to do with the business of Church's Fried Chicken. Accordingly, the Court finds that Defendant Church's is not liable for any actual damages Plaintiff may have suffered. *See, e.g., Smith v. M. System Food Stores,* 156 Tex. 484, 297 S.W.2d 112 (1957); *Rosales v. American Bus Lines, Inc.,* 598 S.W.2d 706 (Tex.Civ.App.–El Paso 1980, *writ ref'd n.r.e.*); *Humbert v. Adams,* 361 S.W.2d 458 (Tex.Civ.App.—Dallas 1962, no writ).

#### b) Liability for punitive damages

■ Since the Court has determined that Plaintiff is not entitled to recover any actual damages against Defendant Church's, it follows without question that Plaintiff cannot recover punitive damages from Defend-

ant. This obvious principle has been explicitly recognized by several courts interpreting Texas law. *E.g., Mack v. Newton,* 737 F.2d 1343 (5th Cir.1984); *Texas National Bank v. Karnes,* 717 S.W.2d 901 (Tex. 1986); *City Products Corp. v. Berman,* 610 S.W.2d 446 (Tex.1980). Accordingly, the Court need not independently consider whether Plaintiff is entitled to an award of punitive damages against Church's Fried Chicken.

### 3. Damages

#### a) Punitive damages

The parties have submitted extensive post-trial briefing on the issue of whether this is an appropriate case for an award of exemplary damages. A plaintiff may recover punitive damages from an assault only where there is a finding of malice on the part of the defendant. *E.g., Bennett v. Howard,* 141 Tex. 101, 170 S.W.2d 709, 712 (1943); *Bolton v. Stewart,* 191 S.W.2d 798 (Tex.Civ.App.–Ft. Worth 1945, no writ). Acts done with gross indifference to the legal rights of others such that they amount to wanton intentional acts without just cause are malicious under law. *See, e.g., Farmers and Merchants State Bank v. Ferguson,* 617 S.W.2d 918, 921 (Tex. 1981); *Lusk v. Onstott,* 178 S.W.2d 549, 554 (Tex.Civ.App.–Amarillo 1944, no writ). Where a tort is committed intentionally and has the outrageous character associated with a crime, an award of punitive damages is permitted. Prosser & Keeton, *Law of Torts,* § 2 (5th Ed.1984).

■ Plaintiff argues that punitive damages are recoverable in this case because the conduct of Defendant Estrada would amount to aggravated sexual assault under the criminal law. Defendant Church's has persuaded the Court that the evidence in this case would not establish either aggravated sexual assault or aggravated assault. *See* TEX. PENAL CODE §§ 22.02, 22.021 (Supp.1988) Although the *definition* of assault under the civil and the criminal law is identical, neither party submits any authority for the proposition that the element of malice which justifies an award of punitive damages under the

civil law is synonymous with the element of aggravation under the criminal law. Accordingly, the Court finds it unnecessary for Plaintiff to prove Jerry Estrada caused serious bodily injury, threatened Plaintiff with a deadly weapon, or that Plaintiff was under 14 years of age to support an award of punitive damages.

■ The Court finds that Jerry Estrada did act with malice in this case. By using his position of authority over Belinda Valdez to solicit sex he committed a wanton act which disregarded Plaintiff's legal rights. Defendant Estrada does all but concede this point in his post-trial briefing: "the conduct of Jerry Estrada does not fall within [the] definition of malice. At most, any such actions amount to no more than inappropraite conduct in a working environment. Of course, should the Court believe that [Plaintiff] was forceably raped and sodomized, such actions would then fall within both the Civil and Criminal definitions of malice." Defendants Supplemental Brief at 5 (Clerk's Docket Entry # 190). The Court, in its factual findings, has determined that Jerry Estrada's action went far beyond "inappropriate conduct in a working environment." Specifically the Court found that Jerry Estrada attempted to rape Belinda Valdez. Accordingly, an award of punitive damages is warranted under the facts of this case.

### b) Causation

Before the Court can calculate the amount of actual damages suffered by Plaintiff and make a determination of punitive damages, it must first settle the thorny issue of causation. The difficulty in this case arises because most of the damages Plaintiff seeks to recover are for mental anguish and psychological injury. Both of Plaintiff's expert witnesses testified that Belinda Valdez was more vulnerable to psychological injury because of serious prior difficulties in her marriage. Defendants maintain that these prior psychological difficulties and vulnerabilities cannot be separated from the traumatic events at Church's Fried Chicken in terms of causation.

Although Plaintiff did not specifically delineate these specific items of damages, in the Court's view, Plaintiff may possibly recover for seven separate items of damages: 1) Physical injuries from the assault itself; 2) Mental anguish from the assault; 3) Injuries arising from her diagnosed condition of post-traumatic stress syndrome; 4) The costs of prior and future counseling; 5) Loss of earning capacity in the past and in the future; 6) Aggravation of marital difficulties; 7) Aggravation of general anxiety and depression.

■ Before the Court reviews the relevant proximate cause standards to apply in this case and considers each item of damages, a critical distinction must be drawn between the post-traumatic stress syndrome diagnosed by Dr. Rodriguez and the more general condition of anxiety and depression discussed by Ms. Healy. Dr. Rodriguez testified that post-traumatic stress syndrome is a narrow diagnostic criteria which requires the presence of several specific symptoms. Ms. Healy's non-medical opinion was that Belinda Valdez was suffering from "depression and extreme anxiety." The Court finds that the depression and anxiety found by Ms. Healy is a broader categorization than post-traumatic stress syndrome. Indeed, it is possible that Plaintiff currently suffers from both conditions, but it is clear to the Court that the conditions are not synonymous. To the extent Ms. Healy's "social worker diagnosis" conflicts with Dr. Rodriguez's medical opinion, the Court accepts the testimony of Dr. Rodriguez.

Many of Defendants' arguments blur this critical distinction. At one point, Church's argues that "the evidence clearly establishes that Belinda Valdez suffered from depression and anxiety to the same degree prior to her employment with Church's as she did after leaving Church's." Trial Brief on Eggshell Skull Doctrine at 4 (Clerk's Docket Entry # 186). In another subsequent brief, Church's argues that "Valdez assumes that her depression and mental suffering did not exist prior to her employment at Church's.... Valdez equates a pre-existing

condition with manifestations of the same type of injury which she now claims with a latent condition. The difference is that Belinda Valdez suffered from *traumatic stress* long before she began working at Church's." Defendant's Reply to Belinda Valdez's Response to Court Order of December 15, 1987 at 8–9 (Clerk's Docket Entry #196). (Emphasis supplied). Although the Court will later analyze Dr. Rodriguez's diagnosis in more detail, these excerpts should make evident that at least Defendant Church's is attempting to collapse the diagnoses of the two expert witnesses into one more general psychological condition.

It is hornbook law that a Plaintiff cannot recover damages unless she can show proximate cause [9] between the wrongful conduct of the defendant and the injuries complained of.[10] Forseeability of the victim's injuries is the prime ingredient of proximate cause and the damage award should attempt to place the plaintiff in the same position as before the tortious conduct of the defendant. *See, e.g., Boles v. La Quinta Motor Inns*, 680 F.2d 1077 (5th Cir. 1982); *Nelson v. Krusen*, 678 S.W.2d 918 (Tex.1984); *Genell Inc. v. Flynn*, 163 Tex. 632, 358 S.W.2d 543 (1962).

■ With this background the Court can now turn to the specific items of damages which may be recoverable in this case. Plaintiff did not testify that she received any physical injuries from the assaultive conduct of Jerry Estrada. Plaintiff's description of the incidents and their effect on her focused on psychological rather than physical injuries. The Court therefore finds that Plaintiff is entitled to no award for physical injuries.

■ Plaintiff did provide testimony about the mental anguish she suffered as a result of the assaultive conduct of Jerry Estrada. Since these incidents Plaintiff claims she is afraid of men, has difficulty sleeping, cries a lot, and is clumsy. Plaintiff's expert witnesses testified that Plaintiff reported suffering from nightmares and felt the need to shower two to three times daily.

The testimony in this case and Plaintiff's performance on the witness stand indicate that Belinda Valdez is a deeply disturbed individual who experienced a violent marriage and suffers from feelings of low self esteem. As the Court will more fully elaborate when it discusses Plaintiff's marital difficulties and her general depression, not all of her psychological problems can be linked to her experiences at Church's Fried Chicken. Nevertheless, the Court finds that the sexual assault did proximately cause Plaintiff mental anguish. Specifically, Plaintiff's expert witnesses directly linked her nightmares and showering behavior and her difficulty sleeping (to be considered separately as a symptom of post traumatic stress syndrome) to the series of incidents at Church's Fried Chicken. There was no evidence that Plaintiff had problems sleeping or exhibited the symptoms commonly experienced by rape victims before the incidents at Church's. There was evidence that Plaintiff often came to work in tears, and the Court declines to find that Plaintiff's crying was causally linked to Defendant's conduct. Plaintiff's asserted fear of men after these incidents at Church's will be addressed in the Court's discussion of possible recovery for lost earning capacity.

As early as 1895 Texas courts recognized that a female plaintiff could recover mental anguish damages from a sexual assault, even when there was no physical contact by the defendant. *Leach v. Leach*, 11 Tex.

---

**9.** The Court's analysis of causation subsumes the elements of "cause-in-fact" and "foreseeability," which is sometimes termed "proximate cause."

**10.** Proximate Cause is defined by the Texas Pattern Jury Charges as:
that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have oc-

curred; and in order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event. 3 Texas Pattern Jury Charges 60.01 (1982), *citing, Rudes v. Gottschalk*, 159 Tex. 552, 324 S.W.2d 201, 207 (1959).

Civ.App. 699, 33 S.W. 703 (1895, no writ) ("It is too plain for argument, we think, that a willful violator of woman's most sacred right of personal security ... [t]hough [the victim's] body be not touched, except by his foul breath and speech, should respond in damages for an outrage to her feelings which proceeds so directly from his concurrent criminal purpose and act.") Subsequent cases have expanded the exception to the general requirement that some physical manifestation must accompany the mental anguish for plaintiff to recover. *E.g., Reicheneder v. Skaggs Drug Center*, 421 F.2d 307, 313 (5th Cir. 1970) (humiliation suffered as result of false arrest); *Moore v. Lillebo*, 722 S.W.2d 683, 685 (Tex.1987) ("Nature of [some] torts assures that claimants will suffer mental injury"—emotional reaction by parent considered natural by-product of wrongful death of child); *Brown and Root Inc. v. City of Cities Municipal Utility*

*District*, 721 S.W.2d 881, 885 (Tex.App.– Houston 1986, no writ) (no proof of physical injuries required to prove mental anguish from damage to home caused by improper design and installation of drainage culvert).[11] In this case, even absent any physical manifestation of mental anguish, the Court finds that the exception noted in these cases applies because sexual assault, by its nature, assures that the plaintiff will suffer some mental injury.

The Court finds that Plaintiff should recover $10,000.00 in damages for mental anguish.

■ Dr. Francisco Rodriguez diagnosed Plaintiff's condition as post-traumatic stress syndrome. In Dr. Rodriguez's medical opinion this condition was caused by the series of incidents at Church's Fried Chicken which culminated in Jerry Estrada's attempted rape.[12]

11. Defendant Church's objects to Plaintiff's use of the *Lillebo* and *Brown & Root* cases for the proposition that "mental anguish is accepted as being self evident in certain acts." While there is language to this effect in the *Brown & Root* opinion, the Court agrees with Defendant that the import of this language is to relax the general requirement that a physical injury must accompany the mental anguish for damages arising from the mental anguish to be recoverable. The causation requirement is not abandoned. In this case, however, the Court has already found that the sexual assaults committed by Jerry Estrada caused Plaintiff's mental anguish.

12. In its post-trial briefing, Church's attempts to impeach the testimony of Dr. Rodriguez by going outside the record. At page 4–5 of Defendant's Reply to Belinda Valdez's Response to Court's Order of December 15, 1987 (Clerk's Docket Entry # 194), Defendant argues "Dr. Rodriguez...did not testify that the cause of Belinda Valdez's depression, anxiety and inability to work was an alleged trauma she experienced at Church's. Dr. Rodriguez had difficulty rendering an opinion ... On the date of his deposition, November 18, 1987, Dr. Rodriguez had not discovered the extent of Belinda Valdez's alleged stress disorder caused by traumatic events in her life during her childhood and during her marriage prior to the time she worked at Church's. After the history of Belinda Valdez was brought to the attention of her counsel...Belinda Valdez was again sent to Dr. Rodriguez. Because of a stipulation between counsel that Dr. Rodriguez would not testify as to any opinion formulated after his deposition, Dr. Rodriguez was unable to testify concerning his opinion of the cause of Belinda Valdez's

condition *after* taking into consideration the previous history of Belinda Valdez that he had not ascertained prior to formulating his initial opinion. It was obvious during his testimony at trial that Dr. Rodriguez had difficulty rendering an opinion ignoring the traumatic events of which he had subsequently learned but was unable to take into consideration. The difficulty Dr. Rodriguez had in ignoring Belinda Valdez's history which he did not take into consideration in formulating his opinion which he gave at trial demonstrates the extent of Belinda Valdez's previous psychological condition and the difficulty in attributing any alleged conduct occurring during her employment at Church's as the cause of Belinda Valdez's alleged current condition." (emphasis added).

The stipulation between counsel concerning the limitations on Dr. Rodriguez's testimony is not before the Court, and the Court considers it improper to accept defense counsel's suggestions of what Dr. Rodriguez's testimony might have been if the stipulation were not in effect. The Court has carefully reviewed the testimony of Dr. Rodriguez and simply disagrees with Defendant's characterization of this testimony. Nowhere in Dr. Rodriguez's testimony did he state that what he offered the Court was only an "initial opinion." At one point, Dr. Rodriguez conceded that his diagnosis was "incomplete" because he did not perform various psychological tests designed to test the patient's truthfulness. Notwithstanding this fact, Dr. Rodriguez had a 70–80% confidence level in his diagnosis. Since the Court has independently found Plaintiff's testimony about whether she was assaulted to be true, it is satisfied that Dr. Rodriguez's

614

According to Dr. Rodriguez, the symptoms of a patient suffering from post-traumatic stress syndrome include distressing recollection of an event which would be stressful to an average person, distressing dreams about the event, sudden acts, intense psychological distress, avoidance of stimuli and the numbing of general responsiveness, decreased interest in normal activities, and difficulty in falling asleep. Dr. Rodriguez testified that all of these items applied to Belinda Valdez.

Dr. Rodriguez prescribed anti-depressant drugs and psychotherapy to treat Plaintiff's condition. In the doctor's opinion, Belinda Valdez's prognosis is very poor and she will require psychiatric care for the rest of her life. Dr. Rodriguez further indicated that Plaintiff may require sexual therapy and behavioral therapy.

At this point it is difficult for the Court to maintain its artificial distinction between the separate areas of damages outlined at the beginning of this section of the opinion. The damages Plaintiff suffered as a result of her post-traumatic stress syndrome cannot be separated from the costs of psychiatric care and counseling. Accordingly, the Court will determine what portion of past and future expenses for psychiatric care and counseling can be attributed to Plaintiff's post-traumatic stress syndrome.

■ Dr. Rodriguez saw Plaintiff on four occasions at a cost of $250.00. Up until trial, Plaintiff incurred $2,700.00 in expenses for the costs of her regular sessions with Ms. Lois Healy. The Court finds that 100% of Dr. Rodriguez's services were necessary for treating the post-traumatic stress syndrome condition suffered by Plaintiff. It is more difficult to attribute 100% of Ms. Healy's services to the condition diagnosed by Dr. Rodriguez. Ms. Healy candidly admitted in her testimony that she was uncomfortable with the word "cause" and testified that Plaintiff's difficulties were "related to" the incidents at Church's Fried Chicken. In another portion of her testimony, Ms. Healy testified that the incidents at Church's were not the only "cause" of Plaintiff's current condition. As the Court has earlier explained, however, it accepts the more specific diagnosis of Dr. Rodriguez rather than the more general diagnosis of anxiety and depression given by Ms. Healy. Even though Ms. Healy did not specifically diagnose Plaintiff's condition, she did provide treatment for Plaintiff. The Court therefore finds that 75% of the costs of Ms. Healy's treatment should be recoverable as damages for Plaintiff's post-traumatic stress syndrome.

■ Although Dr. Rodriguez testified that Plaintiff will require psychiatric care for the rest of her life, the Court is not prepared to make such an unlimited damage award. In discussing the question of

---

expert opinion, based on a reasonable medical probability, more than meets the requirement that Plaintiff show damages by a preponderance of the evidence. The Court finds, contrary to counsel's suggestion, that Dr. Rodriguez did not have difficulty rendering an expert opinion, and in fact did offer the unequivocal opinion that the incidents Belinda Valdez experienced at Church's Fried Chicken caused post-traumatic stress syndrome. Furthermore, Mr. Larry Macon cross-examined Dr. Rodriguez and specifically asked whether his opinion was based on any information about Plaintiff's childhood experiences. Dr. Rodriguez admitted that he had no knowledge of Plaintiff's childhood experiences or relationship with her parents. Mr. Macon specifically asked whether Dr. Rodriguez had any knowledge of Belinda Valdez giving a child up for adoption or of being raped as a teenager. Dr. Rodriguez testified that plaintiff told him she had not been raped before and that he had no knowledge of the adoption. At the conclusion of Dr. Rodriguez's testimony, immediately after he rendered his expert opinion, he testified that nothing Mr. Macon said had made him change his opinion.

Throughout the post-trial briefing Defendant's counsel has insinuated that Plaintiff's early childhood experiences and marital problems, rather than the incidents at Church's Fried Chicken, caused the post-traumatic stress syndrome. Defendants called no expert witnesses to testify on this point and there is no evidence in the record suggesting that post-traumatic stress syndrome can be caused by a bad childhood or marital difficulties which extend over a period of time. The only evidence in the record on this issue was the testimony of Dr. Rodriguez. Dr. Rodriguez testified that post-traumatic stress syndrome is a rigid diagnostic category and that one of the diagnostic criteria is an *event* outside the usual experience which would be stressful to an average person. The Court accepts this testimony.

how long it would be before Belinda Valdez would be able to return to work, Dr. Rodriguez stated that she was disabled indefinitely, but that it was difficult to make an estimate of disability beyond one year. While this testimony concerned Plaintiff's disability from work, the Court finds that any award of medical expenses for the future beyond one year would be too speculative. *See, e.g., Roberts v. U.S. Home Corp.*, 694 S.W.2d 129, 135 (Tex.App.—San Antonio, no writ, 1985). The Court therefore finds that Defendant Estrada is liable for $5,200.00 to cover Plaintiff's future medical expenses.

■ Although not specifically raised by Defendants, the Court will briefly discuss whether Defendant Estrada could reasonably foresee that his actions would cause post-traumatic stress syndrome in Belinda Valdez. *See generally, Kaufman v. Miller*, 414 S.W.2d 164 (Tex.1967). It could be argued that a reasonable person could not foresee that an attempted rape would cause post-traumatic stress syndrome. It is well settled law, however, that the defendant need not foresee the particular injury suffered as long as it is the type of injury which would be normally foreseeable. *See generally*, Prosser and Keeton, *The Law of Torts*, (5th ed. 1984) at 291–292. The Court finds that it was reasonably foreseeable that a victim of an attempted rape would suffer mental anguish, even if the particular form of mental anguish——post-traumatic stress syndrome—— is not understood. Accordingly, holding Defendant Estrada liable for Plaintiff's post-traumatic stress syndrome damages does not violate legal principles of foreseeability. Professor Prosser has written that "… in the absence of knowledge of the Plaintiff's unusual susceptibility, there should be no recovery for hypersensitive mental disturbance where a normal individual would not be affected under the circumstances." *Law of Torts.* 352 (3d ed. 1964), cited in *Kaufman, supra*, at 170. This rule against mental disturbance damages does not apply in this case because one of the criteria for Dr. Rodriguez's diagnosis was that a normal individual would have been affected by the attempted rape. Fur-

thermore, there was evidence in the record that Defendant Estrada did have knowledge of Plaintiff's vulnerability because it was well-known by Church's employees that Belinda Valdez was experiencing marital difficulties.

■ Both Plaintiff and Defendants devote some argument in their post-trial briefing to the issue of what degree the evidence establishes the sexual assault aggravated a pre-existing condition. *See, e.g., Sterrett v. East Texas Motor Freight Lines*, 150 Tex. 12, 236 S.W.2d 776, 778 (1951) ("recovery for an aggravation of a prior diseased condition is allowable when such aggravation results directly and proximately from actionable [conduct], the recovery of course being limited to the increase of ill effects directly and proximately resulting from the injury."). The Court finds this analysis inapplicable to Plaintiff's post-traumatic stress syndrome. As the Court has earlier explained, Belinda Valdez did not suffer from post-traumatic stress syndrome prior to her employment at Church's Fried Chicken. Plaintiff's psychological problems and marital difficulties may have made her more *vulnerable*, but there was no evidence in the record that post-traumatic stress syndrome existed prior to her employment at Church's or was a latent condition. The Court therefore need not grapple with the issue of what degree the assault at Church's aggravated Plaintiff's previous problems. This analysis will be necessary when the Court considers Plaintiff's more general problems of depression and anxiety, but it is not necessary here.

■ The Court has determined that Plaintiff is entitled to a damage award for past and future medical expenses as a result of her post-traumatic stress syndrome. The Court does not think it necessary to make a further award of damages to cover the actual manifestations of Plaintiff's condition, *viz.*, avoidance of stimuli, decreased interest in activities, difficulty sleeping, etc. Although these manifestations of psychological distress may be more pronounced than the mental anguish already

discussed, since the Court has already made an award of $10,000.00 to cover Plaintiff's mental anguish damages, it is not appropriate to make a separate award here.

█ The next issue to consider is Plaintiff's claimed inability to work after her experiences at Church's Fried Chicken. After being terminated from Church's St. Mary's Street store in April of 1985, Plaintiff held five other jobs. Plaintiff testified that she can't work around men since her experiences at Church's Fried Chicken and that she quit jobs at Luby's, Checkers Restaurant, and Alfonso's because she was afraid of men and feared that the same experience which occurred at Church's would happen. Both Dr. Rodriguez and Ms. Healy testified that Plaintiff is afraid of men and has difficulty working around men as a result of her experiences at Church's. In Dr. Rodriguez's opinion, Plaintiff is completely incapacitated from working indefinitely. He was unwilling to predict a permanent work disability beyond one year, however.

Defendants argue that these employment difficulties are a result of psychological problems Plaintiff had before working at Church's. Plaintiff has a simple answer to this argument. The evidence in this case established that despite Plaintiff's marital difficulties she had a good work record. Even Defendant Estrada testified that Belinda Valdez always got good evaluations and that he had input into these evaluations. Estrada did complain about Plaintiff's moodiness at work and claimed she was difficult to get along with, but in light of her good performance evaluations, the Court finds that Plaintiff was a good employee while she worked at Store # 606. This finding severely undermines Defendant's theory. Since Plaintiff was able to perform on the job before the incidents at Church's and was unable to work after the incidents at Church's, the Court finds that Plaintiff's job disability was caused by Defendant's conduct.

█ The Court must now fix an amount of damages for Plaintiff's job disability. The Court finds that Plaintiff was disabled from working in the past and was unable to maintain permanent employment as a result, but that any wages she was able to earn must be deducted from the damage award. The Court further finds the Plaintiff should recover damages for the next one year because of her disability from employment.

█ The period the Court must analyze for the purposes of making a damage award for past employment disability covers April 1985–December 1987. From Plaintiff's testimony, the Court estimates that Plaintiff earned approximately $14,-500.00 from April 1985 until December 1987, despite her disability. With the exception of the housecleaning jobs Plaintiff performed on her own, Plaintiff's jobs paid approximately $3.50/hr. The Court estimates that had Plaintiff been able to hold down full-time employment at Church's during this period, she would have earned approximately $12,000.00. Since Plaintiff's actual earnings exceeded what she would have earned absent the disability, the Court finds that Plaintiff is not entitled to any award of damages for past employment disability.

█ Although it may seem somewhat anomalous to find that Plaintiff is completely disabled from work despite the fact that she was able to work for certain periods of time, the Court accepts the testimony of Dr. Rodriguez and Ms. Healy. Their testimony and Plaintiff's own testimony about her job record since leaving Church's support the finding that Plaintiff experiences great difficulty working around men. Plaintiff may be able to intermittently work on her own as a housekeeper if there are no men she has to work with or serve, but the Court does not think this fact necessarily negates Dr. Rodriguez's finding of total disability. The Court determines that if Plaintiff were able to maintain full-time employment in the next year, she would earn approximately $7,000.00. However, to award this full amount would give Plaintiff an unjustified windfall because her actual earnings from April 1985–December 1987 exceeded what she would have earned at Church's by ap-

proximately $2,500.00. *See E.E.O.C. v. Fotios*, 671 F.Supp. 454, 459–60 (W.D.Tx. 1987) ("The failure to account for this wage differential [between the replacement job and the former job] means that ... Montes would actually be placed in a *better* position than she would have occupied absent the discrimination.") Although the *Fotios* back pay award was made under Title VII, and this award is for future employment disability pursuant to state law, the same principle of compensation applies. The purpose of compensatory damages in tort is to place plaintiff, as near as possible, in the *same* position she would have enjoyed absent the wrongful conduct. Accordingly, the Court finds that Belinda Valdez is entitled to an award of $4,500.00 to cover future employment disability.

 The Court will treat the last two items of possible damages together. The Court finds that no award is appropriate for any aggravation of Plaintiff's marital difficulties. The Court finds it is simply too speculative to attribute any aggravation of Plaintiff's marital problems to her experience at Church's Fried Chicken. Even before her employment at Church's, Plaintiff suffered severe beatings at the hands of her husband and admitted that her husband caused a miscarriage by kicking her in the stomach. Although Plaintiff claimed that the beatings became more severe as a result of the incidents at Church's and Plaintiff attempted to minimize and rationalize the abuse she received, the Court is unwilling to hold Defendant responsible for worsening what was already a terrible domestic situation. The Court is similarly disinclined to make any damage award for aggravation of Plaintiff's general anxiety and depression. The Court finds that Plaintiff suffered severe psychological problems before her employment at Church's and it is not possible to attribute any aggravation of these problems to Defendant's conduct.

To summarize, the Court finds that Plaintiff is entitled to recover the following items of damages:

1. Mental anguish from the
 assault ................ $10,000.00
2. Past medical expenses..... $ 1,825.00
3. Future medical expenses.. $ 5,200.00
4. Future employment dis-
 ability ................. $ 4,500.00
5. Punitive damages ........ $25,000.00

TOTAL: $46,525.00

In addition, Plaintiff is entitled to pre-judgment and postjudgment interest on this damage award. *See, e.g., Crown Central Petroleum Corp. v. National Union Fire Insurance Co.*, 768 F.2d 632 (5th Cir. 1985); *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985). The calculation of these amounts will be set forth in the Court's judgment.

### C. *Title VII Claim for Sexual Harassment*

Sexual harassment claims under Title VII may take one of two forms. As outlined by the Eleventh Circuit Court of Appeals in *Henson v. City of Dundee*, 682 F.2d 897 (1982), Title VII recognizes a sexual harassment case based on a "hostile work environment" or a "quid pro quo" claim where an employer requires sexual consideration from an employee as a bargain for job benefits. *Accord, Jones v. Flagship International*, 793 F.2d 714 (5th Cir.1986). If no tangible job benefit is involved, plaintiff is limited to a hostile work environment claim. *Flagship supra*, at 722 ("The acceptance or rejection of the harassment by an employee must be an express or implied condition to the receipt of a job benefit or the cause of a tangible job detriment in order to create liability under this theory of sexual harassment."). The Court will analyze Plaintiff's factual allegations under both of these paradigms.

#### 1. Quid Pro Quo

 Plaintiff claims that she was actually terminated by Jerry Estrada from the downtown Church's location sometime in March of 1985 and that she was later terminated from the St. Mary's Street store for discriminatory reasons. As the Court has previously found, it rejects Plaintiff's testimony that Jerry Estrada was an Assistant Manager and that he fired her from Store # 606. Instead, the Court finds that Belinda Valdez voluntarily transferred to the St. Mary's Street store because it was

closer to her home. In response to Plaintiff's allegation of a discriminatory termination from the St. Mary's Street store, Church's argues that Plaintiff was terminated for absenteeism rather than sexual discrimination. Under the well established proof doctrine set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny, this defense constitutes a legitimate nondiscriminatory reason for termination. The Court finds that Plaintiff failed to rebut the proffered reason for termination. Mr. Jerry Bailey, Defendant's Personnel Director, testified that Church's employment records reflect that Belinda Valdez was scheduled to work on both Friday and Saturday at the St. Mary's Street store during the second week of April, 1985. Mr. Bailey further testified that Fridays and Saturdays are the busiest times during the week at Church's and that unexcused absence from work during either of those periods would constitute grounds for termination. The Court therefore finds that Plaintiff's termination from Church's Fried Chicken was for legitimate rather than discriminatory reasons.

■ Plaintiff further asserted that Defendant Estrada forced her to frequently clean the bathrooms and do the most difficult tasks in the store. Even if taken as true, these allegations would not support a quid pro quo claim because no "tangible job benefit" is involved.

### 2. Hostile Work Environment

■ Before the commencement of trial Church's moved to dismiss Plaintiff's hostile work environment claim on the grounds that it had never been raised in the Fourth Amended Complaint or in the Pretrial Order. Although the magic words "hostile work environment" do not appear in Plaintiffs' pleadings, the Court is persuaded by Plaintiffs' counsel's argument that the specific factual allegations set forth in the complaint and the Pretrial Order put Defendants on notice of the nature of Plaintiffs' claims. As the Court has previously discussed, prejudice must be shown for the claim to be struck. Accordingly the Court will reach the merits of the hostile work environment claim.

The United States Supreme Court recognized a claim for a hostile work environment, even in the absence of an "economic effect on the complainant's employment," in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 2406, 91 L.Ed. 2d 49 (1986). Not all claims of sexual harassment are cognizable under Title VII, however. In order for sexual harassment to be actionable under Title VII, "it must be sufficiently severe or pervasive 'to alter the conditions of (the victims) employment and create an abusive working environment.'" *Id.* at 2406, citing with approval *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982); and *Rogers v. E.E.O.C.,* 454 F.2d 234, 238 (5th Cir.1971). The issue of when an employer becomes liable for a supervisor's or a co-worker's sexual harassment was explicitly left open by the *Meritor* decision.

In *Jones v. Flagship International,* 793 F.2d 714, 719–720 (1986), the Fifth Circuit delineated the elements a plaintiff must establish to recover under a hostile work environment claim:

(1) The employee belongs to a protected group, i.e., a simple stipulation that the employee is a man or a woman;

(2) The employee was subject to unwelcome sexual harassment, i.e., sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee;

(3) The harassment complained of was based upon sex, i.e., that but for the fact of her sex, the plaintiff would not have been the object of harassment;

(4) The harassment complained of affected a 'term, condition or privilege of employment,' i.e., the sexual harassment must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment;

(5) Respondent superior, i.e., that the employer knew or should have known of the harassment in question and failed to

take prompt remedial action. *See also, Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 309 n. 3 (5th Cir. 1987).

There can be little argument that Plaintiff can successfully establish the first three elements of a hostile work environment claim. The Court has previously determined that Belinda Valdez was subject to unwelcomed sexual harassment which was based upon her sex. Although Defendant Estrada maintained that he treated all of his employees in the same manner, the Court disbelieves this testimony.

 Defendant Church's argues that any sexual harassment which may have occurred was not sufficiently severe or·pervasive to alter the conditions of employment and create an abusive working environment. Although the Court has determined that Plaintiff did not suffer any tangible job detriment, such a finding does not preclude a hostile work environment claim. As the *Flagship* Court noted: "... 'under certain circumstances the creation of an offensive or hostile work environment due to sexual harassment can violate Title VII irrespective of whether the complainant suffers tangible job detriment ...' while an employee need not prove tangible job detriment to establish a sexual harassment claim, the absence of such detriment requires a commensurately higher showing that sexually harassing conduct was pervasive and destructive of the working environment." *Flagship, supra,* at 720 (citations omitted). The *Flagship* Court noted further that a plaintiff's psychological well-being is a term, condition, or privilege of employment within the meaning of Title VII. *Id.* In this case, the Court has determined that Defendant Jerry Estrada sexually assaulted Plaintiff on at least one occasion and this harassment included an attempted rape. The Court therefore finds that Plaintiff's psychological well-being was significantly affected and that she has satisfied this element of her hostile work environment claim.

 Plaintiff's claim founders on her inability to establish that Church's knew or should have known of the harassment in question. Plaintiff may establish knowledge by proving that complaints were lodged with higher management or that the harassment was so pervasive that the employer must have been aware of it. *See, e.g., Katz v. Doyle*, 709 F.2d 251, 255 (4th Cir.1983); *Taylor v. Jones*, 653 F.2d 1193, 1199 (8th Cir.1981); *Bundy v. Jackson*, 641 F.2d 934, 936 (D.C.Cir.1981).

In order to determine whether Church's had notice of the sexual harassment committed by Jerry Estrada, the Court must resolve diametrically conflicting testimony. Plaintiff claims that she lodged complaints about Jerry Estrada's sexual harassment with her assistant manager, Sam Hernandez, her manager, Abel Salazar, and the area supervisor, Marcial Leal. Plaintiff's testimony is somewhat inconsistent on exactly what details she revealed to her supervisors. Throughout most of her testimony, Plaintiff maintained that whenever she broached the matter with Marcial Leal or Abel Salazar, both of them "cut her short," and were not interested in listening to any details of sexual harassment. Toward the end of her testimony upon cross-examination, however, Plaintiff admitted that on at least one occasion Mr. Salazar wanted to know details and told her to go on. All three of these supervisory employees deny that any such conversations took place. Were this a simple swearing match between Belinda Valdez and Abel Salazar and Marcial Leal, the Court would have great difficulty in determining who was telling the truth. The inconsistencies in Plaintiff's testimony have already been recounted. In addition, however, there are aspects of Defendant Salazar's and Defendant Leal's testimony which are not believable. The Court finds, however, that the testimony of Sam Hernandez is by far the most credible of all of these witnesses. Hernandez testified that Plaintiff approached him once and complained that Defendant Estrada was overworking her, but that she made absolutely no mention of any sexual harassment. When Hernandez confronted Estrada with this complaint, he explained that Belinda Valdez was making passes at him but he turned her down

because she was "too ugly." Hernandez was called by Plaintiff, and his testimony on the whole was quite balanced. Aspects of his testimony were favorable to both parties, and if anything, he might have an ax to grind against Church's Fried Chicken because he was fired by Marcial Leal. Despite this possible bias, Hernandez would not support Plaintiff's allegation that he or anyone else at Church's had notice of the sexual harassment committed by Jerry Estrada. The Court accepts the testimony of Sam Hernandez and finds that Plaintiff did not lodge any complaints about sexual harassment with Church's management employees.

■ If there is no direct showing of knowledge, knowledge may be inferred if the sexual harassment complained of was sufficiently pervasive. There is ample evidence in this case that Defendant Jerry Estrada was constantly flirting and touching the female employees at Store # 606. Plaintiff herself admitted, however, that Defendant Estrada did not engage in this type of conduct when Abel Salazar was present. Furthermore, even if an assistant manager saw some of this conduct, it is highly questionable whether this conduct constitutes actionable sexual harassment. Flirting, some casual touching, and sexual innuendos or jokes do not by themselves constitute actionable sexual harassment. *See, e.g., Dornhecker, supra,* at 309 n. 4. This legal observation by no means condones Defendant Estrada's conduct—it demonstrates that only the most serious sexual harassment can be the basis of a federal lawsuit under Title VII. Although the Court accepts the testimony of Rebecca Valadez that Abel Salazar once warned Defendant Estrada not to touch the girls because "it didn't look polite in public," this by itself does not constitute notice of sexual harassment. In short, the Court finds the evidence is insufficient to impute liability on Church's Fried Chicken for the sexual harassment of Jerry Estrada.

Plaintiff argues that the Supreme Court's decision in *Meritor* established that "the absence of notice to an employer does not necessarily insulate that employer from

liability." *Meritor, supra* at 2408. By the same token, however, the *Meritor* court observed that "the Court of Appeals erred in concluding that the employers were always automatically liable for sexual harassment by their supervisors." *Id.* This Court finds that the critical issue was left open by *Meritor* and notwithstanding Plaintiff's suggestion that this Court follow the Tenth Circuit's opinion in *Hicks v. Gates Rubber Company,* 833 F.2d 1406 (10th Cir.1987), this Court is constrained to follow decisions of the Fifth Circuit. The Fifth Circuit in both *Flagship* and *Dornhecker* clearly addressed the issue of employer liability and determined that there must be some knowledge before imposing employer liability. Under this standard, the Court cannot find sufficient notice to find Defendant Church's liable.

■ Plaintiff also attempts to impute liability on Church's by arguing that where a supervisor helps create a hostile working environment and Plaintiff complains against the supervisor, the employer should be liable. In this case Plaintiff argues that Marcial Leal helped create a hostile work environment by his course of conduct over the years at Church's Fried Chicken. Although Plaintiff did testify that Defendant Leal flirted with her as well as many other female employees at store # 606, flirting by itself does not constitute sexual harassment. In this case, lawyers for both sides argued fervently about the admissibility of prior conduct of Marcial Leal. Although the Court heard some of this testimony, it will not utilize it in making its finding regarding Belinda Valdez's claim. The *Flagship* court noted that other incidents of sexual harassment against other employees are not necessarily relevant to the Plaintiff's claim: "Jones has argued that the District Court failed to take into account sexually harassing incidents reported by other female employees. Such testimony, though relevant in a class action suit, does not bear on Jones' individual claim of sexual harassment in the absence of evidence that such incidents affected Jones' psychological well-being." 793 F.2d 714, 721, n. 7. In this case there was no testimony that Defendant Leal's

conduct affected Belinda Valdez's psychological well-being or that Defendant Leal's conduct somehow facilitated the actions of Jerry Estrada. Although Estrada may have seen the area supervisor hugging women at Church's Fried Chicken, he was instructed by his direct supervisor, Abel Salazar, not to hug the girls. While the Court condemns the reprehensible and possibly illegal conduct of Defendant Marcial Leal, his conduct is not the focus of this lawsuit. The Court also rejects Church's asserted defense that there can be no liability where a clear sexual harassment policy is posted on the employer's premises and the Plaintiff fails to take advantage of grievance procedures. The *Meritor* court rejected defendant's view that "the mere existence of a grievance procedure and a policy against discrimination, coupled with respondent's failure to invoke that procedure, must insulate petitioner from liability." 106 S.Ct. at 2409. Defendant Jerry Bailey, the personnel manager of Church's, admitted upon cross-examination that an employer's posted policy means nothing if it is not utilized by the employees. There was further testimony regarding Plaintiff Jorge Torres's claims that other women employees at Church's who complained of sexual harassment did not utilize the grievance procedures.

█ Even if Plaintiff established the notice element of her hostile work environment claim, the Court would be inclined to deny Plaintiff relief. Defendant argues persuasively that Plaintiff's action is moot because both Jerry Estrada and Belinda Valdez no longer work for Church's Fried Chicken. Since the Court has previously determined that Belinda Valdez suffered no tangible job detriment as a result of the sexual harassment, her claim is a pure hostile environment claim. Ordinarily under Title VII, the Court may award a victorious plaintiff reinstatement, backpay, or "any other equitable relief as the court deems appropriate." 42 U.S.C. 2000e–5(g). The D.C. Circuit determined in *Bundy v. Jackson*, 642 F.2d 934, 936 n. 12 (1981), that the only relief available in a pure hostile environment case is injunctive relief. *Accord Meritor, supra,* at 2411 (MARSHALL, J.,

concurring); *but see Henson v. City of Dundee,* 682 F.2d 897, 905 ("we note that Hensen does not seek reinstatement to her position in the Dundee Police Department. It is therefore unlikely that Hensen will be able to obtain an injunction to restrain practices in the police department which have injured her in the past but which no longer affect her ... Additionally, Hensen cannot recover damages for mental suffering or emotional distress under Title VII. She may, however, recover nominal damages if she prevails in a new trial and thereby become eligible for an award of attorney's fees.")

The Court declines Plaintiff's invitation to grant injunctive relief in this case. Even assuming that Church's had knowledge of the sexual harassment, the Court agrees that Plaintiff's request for injunctive relief is moot because there is no reasonable expectation that the conduct will recur. *United States v. W.T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). *See also County of Los Angeles v. Davis,* 440 U.S. 625, 635, 99 S.Ct. 1379, 1385, 59 L.Ed. 2d 642 (1979) (where interim events have completely and irrevocably eradicated the effects of the alleged violation and there is no reasonable expectation the violation will recur, the action for injunctive relief is moot). For all the foregoing reasons the Court finds that Plaintiff is not entitled to any relief against Defendant Church's Fried Chicken for her Title VII claims of sexual harassment.

## II. CLAIMS OF PLAINTIFF JORGE TORRES

█ The irony of this case is that once Belinda Valdez's anonymous EEOC claim was formally presented to Church's Fried Chicken, the company took prompt remedial action. Unfortunately, by suspending Jorge Torres Church's moved too promptly against the wrong man. It is this mistake which gives rise to Plaintiff's claims. Plaintiff Jorge Torres initially raised several claims, but these allegations were narrowed to three by the commencement of

trial.[13] The Court will address these claims in turn.

### A. *State Law Implied Contract Claim*

Although Jorge Torres originally raised numerous pendent state law claims, prior to trial he abandoned all of these claims with the exception of the breach of implied employment contract claim. The sole authority Plaintiff relies on is *KWS Manufacturing Company, Inc. v. McMahon*, 565 S.W.2d 368 (Tex.Civ.App.–Waco 1978, writ ref'd n.r.e.).

In *McMahon*, Plaintiff sued the corporation and the three individual co-principals for fraud and wrongful termination of employment. Although Plaintiff was allowed recovery under both theories, the appellate court's decision was based on the jury's finding of an *express* agreement between Plaintiff and Defendants that Plaintiff would own 5% of the corporation's stock and have employment for an indefinite period of time. *Id.* at 372.

The Court agrees with Defendants that *McMahon* is readily distinguishable from the present case. Here there is no allegation or proof of any express employment contract between the parties. Plaintiff argues that Church's employee handbook created a binding implied contract which only allowed Church's to terminate Plaintiff for just cause. It is well settled in Texas, however, that an employee handbook and annual appraisal of an employee's job performance absent an express agreement cannot create a contract of employment. *Vallone v. Agip Petroleum Company,* *Inc.,* 705 S.W.2d 757 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.).

It is also the general rule in Texas that absent a specific contractual agreement, an employer may terminate an employee for any reason without liability. *E.g., Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733 (Tex.1985); *Vallone, supra; Maus v. National Living Centers, Inc.,* 633 S.W.2d 674 (Tex.App.—Houston 1982, writ ref'd n.r.e.). As a federal district court interpreting state law, this Court is constrained by the clear pronouncements of Texas state courts and finds that Plaintiff Jorge Torres is not entitled to recover under *McMahon* or any implied contractual theory. Accordingly, this claim is dismissed.

### B. *National Origin Discrimination*
#### 1. Liability

Before the Court reaches the merits of Plaintiff's Title VII national origin claim, it must first consider Defendant Church's argument that the claim must be dismissed because it was not properly and timely raised in Plaintiff's Fourth Amended Complaint or in the Pretrial Order. The Court considered and rejected this argument orally before the commencement of trial. At all times in this lawsuit Defendants had notice that Jorge Torres was challenging the circumstances of his suspension and ultimate termination. The only new evidence presented in support of the national origin claim became known to Defendants approximately one week before trial when Horacio Figueroa, a current manager at another Church's location, testified that Marcial Leal on two occasions

---

13. In addition to the three claims Plaintiff pursued at trial, Plaintiff now wishes to add a fourth claim *after* trial. On December 28, 1987, in response to the Court's order for further legal briefing, Plaintiff requested that the Court consider a state law claim under the Restatement of Torts § 46 for extreme and outrageous conduct by Defendant Church's, absent any allegation of an employment contract. Up until this point, the Court has been extremely forgiving of Plaintiff's failure to properly plead his case. The Court must draw a line somewhere, however, and Plaintiff has crossed that line. If the trial process is to have any meaning, the parties must be bound by the allegations and legal theories actually raised during the trial itself. No adjudication would ever be final if the parties were allowed to revise their legal theories after the close of the evidence. This is particularly true here where it appears that Plaintiff has raised a new legal theory in an attempt to conform to a hypothetical version of the facts presented by the Court *after* the close of the evidence. The Court also notes that Plaintiff failed to locate the legal authority requested which would have revitalized his national origin claim under the hypothetical question raised by the Court on December 15th, and instead made this belated effort to recover under a completely new legal theory. Under these circumstances, Plaintiff's request to amend his pleadings and add a new legal claim at this late stage is DENIED.

said that he wanted to fire Jorge Torres because he was a "wetback." Since this was the only direct evidence offered by Plaintiff in support of his national origin claim, Church's was not unfairly ambushed. The determination of whether Marcial Leal made the alleged discriminatory statement boils down to a swearing match between Leal and Figueroa and a credibility determination by the Court. In addition, the EEOC claim filed by Jorge Torres before he brought this federal lawsuit specifically raised the issue of national origin discrimination. *See* Plaintiff's Exhibit 4. In short, the Court finds that there was no unfair surprise or prejudice by allowing Plaintiff to go forward with this claim and the Court incorporates by reference the authority relied on previously in allowing Plaintiff Belinda Valdez to prosecute her assault claim.

Belinda Valdez filed an anonymous claim with the Equal Employment Opportunity Commission sometime in August of 1985. The Complaint charged that "top management staff" at Church's Store No. 606 had engaged in sexual harassment from January 2, 1985, until the present. Church's national office received the EEOC charge on August 28, 1985. Immediately thereafter, the charge was forwarded to Jerry Bailey and Marcial Leal. Bailey instructed Leal to conduct an investigation and Leal met with store manager Abel Salazar and assistant manager Jorge Torres on September 1, 1985 to discuss the EEOC complaint. After a one-day investigation, Jorge Torres was suspended by Marcial Leal on September 2, 1985. Plaintiff Torres was suspended by Church's despite the fact that it is obvious from the face of the EEOC complaint, *see* Plaintiff's Exhibit 1, that Torres was not employed at the downtown Church's location for a significant period of time during the alleged sexual harassment. In fact, Jorge Torres and Belinda Valdez never worked together at any Church's location. Shortly after Plaintiff's suspension on September 2, 1985, he filed his own complaint with the EEOC against Church's Fried Chicken. The circumstances and tim-

ing of Plaintiff's ultimate termination from Church's are somewhat unclear.

Plaintiff is a native of El Salvador. He came to the United States for the first time in 1979. Plaintiff's first job at Church's Fried Chicken was at the downtown store beginning in 1981 as a team member under the supervision of assistant manager Horacio Figueroa and manager Donald Gary. After approximately two years at the downtown location, Plaintiff was transferred to Store No. 77 where he remained for six months. After the six month stint at Store No. 77, Plaintiff returned to the downtown store and remained there until approximately May of 1984. Plaintiff was transferred again to Church's Store No. 568 on Wurzbach on the northwest side of the city. Plaintiff remained at the Wurzbach location until April of 1985. Plaintiff requested a transfer from the Wurzbach location because of his admitted difficulty with the English language, and he believed he would be more comfortable at the downtown location where more Spanish was spoken.[14] At the request of Abel Salazar, Plaintiff was transferred again to the downtown location in the position of assistant manager sometime in April of 1985. At this time, Sam Hernandez, the previous assistant manager, and Belinda Valdez were no longer working at this location.

In a discriminatory treatment Title VII case, the Court should undertake a three-step analytic process in assessing the evidence. Although the burden or proof remains at all times on Plaintiff to show by a preponderance of the evidence that he was a victim of illegal discrimination, *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), the burden of production shifts under the three-part framework. *See Burdine, supra; Board of Trustees v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff initially carries the burden of production to estab-

---

**14.** Although Plaintiff utilized a translator at times during his testimony in Court, for the most part, he was able to communicate effectively in English.

lish a prima facie case of discrimination by a preponderance of the evidence. If Plaintiff successfully establishes the prima facie case he creates the legally mandatory rebuttable presumption of discrimination. *Burdine,* 450 U.S. at 254 n. 7, 101 S.Ct. at 1094 n. 7. In the second stage, the burden of production shifts to the employer to come forward with a legitimate nondiscriminatory reason for the job action. Defendant need not persuade the Court at this stage that the proffered reason was the real reason for the job action, but must only create a genuine issue of fact. Where strong, direct evidence of discrimination is presented, the employer shoulders a greater burden and must prove by a preponderance of the evidence that the same employment decision would have been reached even absent the presence of the discrimination factor. *Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir. 1982), *citing, Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *see also Guillory v. St. Landry Parish Police Jury,* 802 F.2d 822, 824 (5th Cir.1986). Since a combination of direct, comparative, and circumstantial evidence supports Plaintiff's case, the Court will employ the *McDonnell Douglas* framework, and not require Defendant to prove its rebuttal justification by a preponderance of the evidence. In the third stage, the burden of production shifts once again to the Plaintiff, and merges with the ultimate burden of persuasion to show intentional discrimination, to show that the reasons offered by Defendant are pretextual. Plaintiff may make a showing of pretext by establishing that the rebuttal justification offered by the employer has not been applied evenhandedly or that Defendant's reason is not worthy of credence.

In order to establish a prima facie case of national origin discrimination with respect to discharge, Plaintiff must prove the following elements:

(a) that the employee was a member of a protected class;

(b) that he was qualified for the job from which he was discharged;

(c) that he was discharged; and

(d) that the employer filled the position with a non-minority member after the discharge or retained a non-minority employee who had engaged in conduct similar to that for which the employee was terminated.

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668; *Junior v. Texaco, Inc.,* 688 F.2d 377 (5th Cir.1982); *Davin v. Delta Airlines, Inc.,* 678 F.2d 567 (5th Cir.1982). Other courts have used variants on this four element test. *See, e.g., Brown v. Parker–Hannifin Corp.,* 746 F.2d 1407, 1410 (10th Cir.1984); *Whiting v. Jackson State University,* 616 F.2d 116, 121 (5th Cir. 1980). This four prong test is not to be rigidly applied, however. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1817 n. 13. Even where plaintiff fails to establish all elements of the four-prong test, the prima facie case can still be satisfied where plaintiff shows that he was discharged from a position "under circumstances which give rise to an inference of unlawful discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

In this case there is no question that Plaintiff has easily satisfied the first three elements of his prima facie case. Defendant concedes that Jorge Torres was born in El Salvador, that he was discharged, and that he was qualified for the assistant manager's position from which he was discharged. In fact the testimony established that Jorge Torres was an extremely hardworking employee who earned promotion to Church's largest volume store in San Antonio.

 Defendants do contest the last element of the prima facie case, however. Church's argues that there is no evidence to show that they assigned a non-minority person to Plaintiff's job or that there was any showing that the termination was motivated by unlawful discrimination. The Court disagrees. Horacio Figueroa testified that on two occasions Defendant Marcial Leal suggested that Jorge Torres should be fired because Church's already had too many "wetbacks." Although Leal

fervently denies this statement, the Court believes the testimony of Figueroa. As a current manager at Church's, Mr. Figueroa could be considered a reluctant witness. Nevertheless, he provided testimony against his own employer.[15] Marcial Leal, on the other hand, has an obvious interest in denying that discrimination played any role in Jorge Torres' suspension and ultimate termination.

Church's claims that Jorge Torres was fired for a legitimate non-discriminatory reason: sexual harassment, albeit sexual harassment not alleged in the anonymous EEOC complaint. It is undeniable if Plaintiff were guilty of sexual harassment, or if Church's reasonably believed that he was guilty of sexual harassment, this would constitute a legitimate non-discriminatory reason for his suspension and termination.

■ At the time of Plaintiff's suspension, Church's had statements from two female employees accusing Jorge Torres of sexual harassment.[16] Janet Gonzales, who still worked for Church's at the time, had complained about Jorge Torres two months before his suspension. On that occasion she told her manager, Abel Salazar, that Jorge Torres had grabbed her and put his arms around her in an offensive manner. The manager confronted Plaintiff with this accusation and Torres denied that he intended to touch Ms. Gonzales in an offensive manner. Plaintiff contended that he was wearing a cast at the time and reached out to grab Ms. Gonzales after losing his balance. Salazar made no notation of this allegation because he felt the complaint was unsubstantiated and he did not report it to higher supervisors. As a precautionary measure, however, he told Mr. Torres to leave the girls alone. It is undisputed by Plaintiff that he was a very tough assistant manager and that many of the female employees did not like him because he forced them to work hard. At the time of the investigation into the EEOC anonymous complaint, Mr. Salazar approached Janet Gonzales for a statement because she had made a previous complaint against Jorge Torres. Although Janet Gonzales testified at trial, the Court decides that it is not necessary to evaluate her credibility.

■ The other witness who made allegations against Jorge Torres before his termination was Mercy Perez. She did not testify at trial. Her statement was taken by Abel Salazar under highly suspicious circumstances. Perez had been fired almost a month earlier,[17] and Mr. Salazar maintains that she was in the store as a customer on August 30th or September 1st when he talked with her about the alleged sexual harassment. Mr. Salazar further maintains that he did not approach Ms. Perez, but that he met her coincidentally while serving her across the counter and that she brought up the subject of sexual harassment.[18] Mercy Perez claimed that Jorge Torres had pinched her and rubbed

---

15. The Court is aware that Mr. Figueroa's wife has a cause of action pending against Church's in state court. Mr. Figueroa is not involved in his wife's dispute, however, and on balance the Court still considers this witness to be reluctant in light of his managerial position with the Defendant.

16. In so carefully scrutinizing the circumstances surrounding these statements, the Court is mindful that it should not become a super-personnel department in reviewing Defendant's justification for the adverse job action. The employer's business decisions are entitled to a great deal of deference in a Title VII lawsuit. *See, e.g., Thornbrough v. Columbus and Greenville Railroad Co.,* 760 F.2d 633, 647 (5th Cir. 1985). The issue here is not necessarily whether the allegations against Jorge Torres were true, but whether Church's was reasonable in taking action. To get a complete understanding

of the facts in this case and to analyze the proffered reason for pretext, the Court will undertake a detailed review of the circumstances surrounding Plaintiff's suspension and discharge.

17. Mr. Torres maintains that Abel Salazar fired Mercy Perez. Mr. Salazar maintains that Jorge Torres did the firing. In reaching its ultimate decision, the Court need not resolve this particular swearing match.

18. The Court regards this version of the conversation as highly questionable. It is difficult to imagine that in the course of ordering a fast food meal a former fired employee would casually mention that she had been sexually harassed by an assistant manager without prodding from the manager conducting the investigation.

against her in an offensive manner, in addition to denying her request to use the restroom during work hours. Mr. Salazar acknowledges that Mercy Perez made an earlier complaint against Jorge Torres alleging that Plaintiff forced her to buy him tacos when she arrived late for work. Apparently, however, Ms. Perez did not bring up the subject of sexual harassment when she made the taco buying complaint. To make the circumstances of this witness's allegations more suspicious, she was offered reinstatement by Church's after she provided this information against Jorge Torres. Mr. Salazar attempts to explain this apparent gratuity by stating that he thought it fair to reinstate Ms. Perez because she had left due to Jorge Torres' sexual harassment. This explanation seems inconsistent with the testimony of Mary Helen Mendoza, perhaps the second completely credible witness heard at trial. Ms. Mendoza testified that Ms. Perez and Ms. Ida Zuniga came to her restaurant applying for a job after they had been terminated from Church's. Ms. Zuniga complained that she had been sexually harassed by Jorge Torres, but Ms. Perez made no mention of any such allegations, at a time when one might expect she would come forward. According to the testimony heard at trial, Ms. Perez did not come forward to complain about Jorge Torres' sexual harassment until her over-the-counter conversation with Abel Salazar. If Salazar's testimony is to be believed, Ms. Perez failed to come forward on at least two previous occasions when it would reasonably be expected that she would voice a complaint. The Court does not find that Church's was unreasonable in accepting the complaints of Gonzales and Perez. The circumstances of the Perez accusation do lead the Court to find that she did not come forward voluntarily. Instead, the Court determines that Abel Salazar's investigation of the EEOC complaint was not an objective inquiry because it focused on Jorge Torres.

Two other witnesses (Mary Helen Mendoza and Ida Zuniga) testified against Jorge Torres at trial, but it is not apparent from the testimony when these allegations of sexual harassment against Jorge Torres became known to Abel Salazar and Defendant Church's. The Court will now determine what significance the testimony of these two witnesses merits.

The investigation of Belinda Valdez's anonymous complaint was remarkably swift. Marcial Leal told Abel Salazar to conduct an investigation by interviewing all Store No. 606 employees, male and female, on either August 30th or September 1, 1985. Jorge Torres was suspended on September 2nd, less than two days later. Ms. Zuniga did not specify at what time during her employment at Church's she had been harassed by Jorge Torres and at what time she told Abel Salazar of the sexual harassment. Similarly, Mary Helen Mendoza, a manager who worked at an adjacent fast food restaurant, did not remember exactly when she notified Abel Salazar of the allegations against Jorge Torres. Ms. Mendoza testified that on one occasion she went into the Church's back entrance to borrow a $CO^2$ container when she witnessed Jorge Torres with his hand between the legs of a female employee. Ms. Mendoza regarded the incident as sexually offensive. Ms. Mendoza further testified that Ida Zuniga approached her about a job at her restaurant and told her that Jorge Torres had sexually harassed her. Ms. Mendoza approached Abel Salazar to tell him about these incidents and to offer a possible explanation for the reason many female employees had left Church's downtown location. The Court has real questions about the credibility of Ida Zuniga and the allegations made by Mercy Perez. Moreover, it is not clear whether the allegations made by Ms. Mendoza or Ms. Zuniga were known to Church's at the time it was decided to suspend Jorge Torres.[19]

19. If Church's learned of these allegations well before Plaintiff's suspension but took no action, it would support the inference that Church's had a policy of tolerating sexual harassment. On the other hand, if Church's learned of these allegations after the suspension but before the firing, these allegations would be a valuable defense to a retaliation claim. Since the Court cannot determine at what point in time Church's became aware of these other allega-

Nevertheless, the Court determines that Defendant has satisfied its burden to come forward with a legitimate non-discriminatory reason for the termination. The testimony of Mary Helen Mendoza makes clear to the Court that Jorge Torres was guilty of some sexual harassment.

■ At this stage, the burden of production once again shifts to the Plaintiff. Since Plaintiff's showing of pretext is the most important legal and factual issue before the Court, it is appropriate at this point to carefully outline the relevant law. The *Burdine* court explained the plaintiff's burden at this stage of the litigation:

Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

The plaintiff retains the burden of persuasion. She now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden merges, with the ultimate burden of persuading the Court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *See McDonnell Douglas*, 411 U.S., at 804–805 [93 S.Ct. at 1825]. 450 U.S. at 255–256, 101 S.Ct. at 1094–95.

The *Burdine* court went on to note that "there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation." *Id.* at n. 10.

The Court will now examine Defendant's proffered reason against this legal standard. At the outset, it must be emphasized, that the Court believes that Jorge Torres did commit some sexual harassment. Although this conduct would justify firing in most cases, Plaintiff can establish pretext if he shows that other employees committing similar acts were not suspended or terminated. *See, e.g.,* C. Richey, *Manual on Employment Discrimination Law and Civil Rights Actions in the Federal Courts* (Federal Judicial Center rev. ed. 1986) at A–40, *citing, e.g., Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *Sabol v. Snyder*, 524 F.2d 1009, 1012–13 (10th Cir. 1975).

After considering all the evidence, the Court finds that Church's reason for suspending and ultimately terminating Jorge Torres was pretextual. Plaintiff successfully established that Defendant's proffered reason was pretextual for two independent reasons. First, the Court infers that the real purpose of the two day investigation was to single-out Jorge Torres, and that Defendant's justification is therefore unworthy of credence. Second, the Court finds that Jorge Torres was not treated similarly to other Church's employees accused of sexual harassment in that his suspension and termination actually violated Church's de facto policy of tolerating sexual harassment.

A review of Church's internal investigation will demonstrate that the reason proffered by Defendant is unworthy of credence. The Court has already commented on the remarkable speed with which this investigation was initiated and concluded. The event which prompted Church's internal investigation was the anonymous EEOC letter the company received late in August of 1985. Despite Jerry Bailey's knowledge of allegations of sexual harassment against Marcial Leal, and the face of the EEOC complaint itself, which accuses top management at store No. 606 with sexual harassment, Mr. Bailey put Marcial Leal in charge of the investigation. Plaintiffs' lawyers continually harped on a very apt analogy: The investigation in this case

tions against Jorge Torres, they will not form a basis for the Court's decision.

was like the fox in the proverbial chicken coop. If the complaint is literally taken as true, only two individuals could have been guilty of the sexual harassment: Abel Salazar or Jorge Torres. Notwithstanding this fact, Marcial Leal thought it appropriate to place Abel Salazar in charge of the investigation, rather than calling in an independent investigator from some other branch of the company. Abel Salazar therefore had an obvious interest in the outcome of the investigation. In fact, Jorge Torres testified that immediately after Marcial Leal presented the complaint to Salazar and himself, Salazar made it clear that either Torres or himself was guilty, and that Salazar denied doing any of the harassment. Although Mr. Salazar generally denies that his investigation focused on Jorge Torres, he does not specifically deny Mr. Torres' version of this conversation and the Court accepts it as believable.

Other testimony revealed that the conduct of the investigation itself was remarkably shoddy. The law firm which currently represents Plaintiff in this case, and represented Belinda Valdez at the time, was listed on the face of the EEOC complaint. Defendants at no time offered any credible explanation for why the law firm was not at least contacted to find out more details about the rather vague allegations of sexual harassment. Furthermore, Abel Salazar admitted that he called in Janet Gonzales to give a statement because she had made earlier allegations of sexual harassment against Jorge Torres. No credible explanation is given for Salazar's treatment of the complaint two months earlier as unsubstantiated and not significant enough to pass on to higher authorities at Church's Fried Chicken. Apparently, by September of 1985, Ms. Gonzales' testimony achieved new credibility in the eyes of Church's management. Although Mr. Salazar denies that he asked any employee specifically about Jorge Torres, and instead conducted his interviews on a general level, Rebec-

ca Valadez testified that she was asked specifically about Jorge Torres. Mr. Salazar accuses Ms. Valadez of lying in this regard, but the Court finds her testimony believable, especially in light of the fact that she gave considerable testimony which was favorable to Church's Fried Chicken on Plaintiff Belinda Valdez's claims. As previously noted, the circumstances surrounding Mr. Salazar's interview of Mercy Perez are highly suspicious. Mr. Salazar's account of the exchange is not credible in the Court's view. Even if there was no quid pro quo agreement regarding Ms. Perez's testimony and her subsequent reinstatement, the Court finds that Abel Salazar was attempting to make a case against Jorge Torres.

Perhaps the single greatest indication of the carelessness of this investigation is the fact that Jorge Torres could not have physically committed any of the sexual harassment mentioned in the EEOC complaint between January 2, 1985 and April, 1985. Despite this glaring factual incongruity, Church's management (Mr. Salazar, Mr. Leal, and Mr. Bailey) continued to tell Jorge Torres that they had two witnesses who supported the EEOC complaint. As the trial of this matter made obvious, Jorge Torres may have been guilty of some sexual harassment, but he was not guilty of the sexual harassment complained of by Belinda Valdez. That Church's did not discover this or acknowledge this is evidence in the Court's view of an investigation designed to finger one man.[20]

The Court independently finds that sexual harassment was merely a pretext for the suspension and termination of Jorge Torres because other Church's employees accused of similar acts were not suspended or terminated. The legal effect of this comparative evidence is that Plaintiff has successfully established a final showing of intentional discrimination. *See* Schlei & Gross-

20. There was some testimony from Mr. Bailey that the investigation of the anonymous EEOC complaint did not cease upon the termination of Jorge Torres. Mr. Bailey claimed that Church's attorneys, presumably Mr. Macon and Mr. Castillo, were asked to complete the investigation once a formal EEOC complaint was filed. Unfortunately, like much of Mr. Bailey's testimony, this claim was insufficiently explained and the Court refuses to utilize it to explain away the glaring inadequacies and selectiveness of Church's own investigation.

man, *infra*, at 1314–1315 and accompanying discussion. Horacio Figueroa testified that when he was accused of sexual harassment, Church's management helped him in his defense and offered him a polygraph examination to clear his name. Figueroa was not suspended at the time of the sexual harassment allegations. By contrast, Jorge Torres was never given the opportunity to take a polygraph examination or to provide a statement of his version of the events. Mr. Jerry Bailey's attempt to explain and distinguish the investigations of the Figueroa allegations and the Torres allegations are nothing but bureaucratic double-talk in the view of the Court. Mr. Jerry Bailey brought in a lawyer to handle the Figueroa investigation but decided to handle the Torres investigation "internally" because it was "easier for me." [21] The Defendants' explanations of the opportunity they afforded Plaintiff to provide a written statement or a polygraph exam also do not withstand scrutiny. Jorge Torres approached Church's management on at least two occasions after his suspension and continued to profess his innocence. The explanations provided for why no statement was taken from Mr. Torres are neither consistent nor persuasive. Mr. Salazar claimed that Torres was not given the opportunity to take the polygraph because it was seldom done, the investigation was still on-going, and he did not see Mr. Torres come forward with anything. Mr. Leal testified that polygraph examinations were "sometimes given." Mr. Bailey testified that he decided to handle this investigation internally. As for the lack of a formal statement from Mr. Torres, Mr. Leal testified that Mr. Torres was given an opportunity to give a statement. Apparently, Mr. Leal equates a verbal denial of the allegations with a written statement. This testimony at trial is inconsistent with his deposition testimony of April 29, 1986, in which Mr. Leal stated that if employees wanted to give a statement the company would take

one. Mr. Bailey testified that Church's did not defend Mr. Torres because he had already been suspended and there was no reason to help him because he had already filed suit with the EEOC and Bailey directed Torres to seek further assistance there. Mr. Bailey explains the statement that Torres eventually provided to the EEOC was not included in Church's "statement of inquiry", *see* Plaintiff's Exhibit 8, because Torres had already had his say in the office when he verbally denied the sexual harassment. None of this testimony sufficiently explains why Jorge Torres was treated differently from Horacio Figueroa or other Church's employees accused of sexual harassment.

Notwithstanding Mr. Bailey's rather dramatic assertion that the company's treatment of sexual harassment was "about as serious as a heart attack," he admitted that the allegations of Marcial Leal's sexual harassment were never investigated. In the face of this admission, Mr. Bailey still maintained that Church's does not have a "selective investigation policy." Sam Hernandez, a former assistant manager at Church's, testified that it was well known among managers at Church's that Marcial Leal was a womanizer.

Mr. Abel Salazar testified that Jorge Torres was the first employee directly under him who had been accused of sexual harassment. In addition, Mr. Salazar admitted that although this was not the first case of sexual harassment at Church's, it was the first suspension that he knew of. He further admitted, in perhaps the most damaging testimony against Defendant, that other employees at Church's Fried Chicken were just talked to for similar behavior. This collective testimony makes it abundantly clear to the Court that sexual harassment was not the real reason Jorge Torres was suspended and terminated from Church's Fried Chicken.

As previously mentioned, a Title VII plaintiff may successfully combat the em-

---

**21.** The circumstances of the anonymous complaint makes this explanation insufficient and transparently unreasonable. If ever an investigation warranted an independent outsider, this one did. Despite years of experience, Mr. Bailey apparently decided it was proper to entrust a sexual harassment investigation to two management officials who themselves were accused of sexual misconduct.

ployer's proffered justification by one of two alternate means. First, the plaintiff may combat the rebuttal evidence *directly*, by showing that intentional discrimination more likely motivated the employer's adverse job action. Second, the plaintiff may combat the rebuttal evidence *indirectly* by showing that the proffered explanation is unworthy of credence. In this case, the Court finds that Plaintiff has successfully demonstrated pretext by a preponderance of the evidence on both methods of proof. Furthermore, either of these responses to Defendant's rebuttal justification would independently support a verdict in Plaintiff's favor.

The three-part method of proof in a Title VII employment discrimination case is merely an analytical tool to be used by the factfinder. Evidence heard in one stage of the case should not be divorced from evidence heard in other stages of the case and the ultimate factual inquiry of whether the employer committed intentional discrimination. *See e.g., United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711 at 715, 103 S.Ct. 1478 at 1482, 75 L.Ed.2d 403.

In this case, Plaintiff produced substantial direct evidence which supports a finding of intentional discrimination. Mr. Horacio Figueroa testified that Marcial Leal told him on two separate occasions that he would like to get rid of Jorge Torres because Church's already employed too many "wetbacks." Although Marcial Leal denies making the statements and claims Torres' promotion to the assistant manager position at Church's highest volume store dispels any possible discriminatory motive, the Court does not accept this testimony. The Court accepts Plaintiff's testimony that he won the promotion despite Leal's feelings toward him and that he was needed at the

downtown store by Abel Salazar. Apparently, Plaintiff was tolerated as long as he was extremely productive, but when Leal and Salazar needed a scapegoat, he was the convenient victim of the internal sexual harassment investigation.

The Court also finds that the evidence of disparate treatment in the investigation of the sexual harassment allegations made against Mr. Torres is further direct evidence of intentional discrimination.[22] Plaintiff's clear showing that he was not treated comparably to similarly situated employees of different national origins may by itself establish intentional discrimination. It must be recalled that Defendant Salazar himself admitted that other employees had committed sexual harassment, but that nobody other than Jorge Torres had been suspended or terminated as a result. As Schlei and Grossman observed: "Comparative evidence is usually *determinative* on the issue of pretext. The plaintiff attempts to introduce evidence showing that in a comparable factual situation persons in a different protected group were treated more favorably, or that the defendant departed from its normal policies, which would imply a differential in treatment from other similarly situated persons. The defendant would attempt to respond with evidence that the persons cited by the plaintiff were not in comparable factual situations, or that comparably situated persons not in plaintiff's protected group were treated in the same manner as the plaintiff." *Employment Discrimination Law* (1976) at 1314–15. (emphasis added). *See also, Corley v. Jackson Police Department*, 566 F.2d 994, 999–1000 (5th Cir.1978) (court must compare black plaintiff's treatment with similarly situated white employees); *Lindsey v. Angelica Corp.*, 508 F.Supp. 363, 366 (E.D.Mo.1981) (plaintiff

---

**22.** Strictly speaking, this evidence is not direct in the sense that the Court must make a further inference from this evidence to conclude that intentional discrimination motivated the job action. In another sense, however, the comparative evidence is "direct" in that it bridges the gap between a mere showing of pretext and a showing of pretext *for intentional discrimination.* The Court also understands that the evidence presented in this case cannot always be neatly compartmentalized. *See Dillon,* 746 F.2d at 1003. In reaching the later indirect conclusion that Church's proffered reason was "unworthy of credence," the Court did utilize some of this comparative evidence. *See Miles v. M.N.C. Corp.,* 750 F.2d 867, 870 (11th Cir.1985) ("Three types of evidence can be used by a plaintiff to prove pretext: 1) comparative evidence; 2) statistical evidence; and 3) direct evidence of discrimination ...").

showed pretext by demonstrating that employer acted contrary to its own policies).

In this case, Defendant attempted unsuccessfully to explain why Mr. Torres was treated differently from Mr. Figueroa. Furthermore, no explanation whatsoever was offered as to why the allegations of sexual harassment against Marcial Leal were never investigated or why Mr. Torres was the first employee ever suspended or terminated for sexual harassment. It is also clear that Church's went against its own policy of tolerating sexual harassment when it decided to suspend and terminate Jorge Torres. Taken together, all this evidence constitutes a *direct* showing by a preponderance of the evidence that intentional discrimination more likely motivated Church's decision to suspend and terminate Jorge Torres. It should be recalled that *Burdine* allows a plaintiff to demonstrate pretext either directly or indirectly. After determining that Plaintiff has succeeded in making this direct showing, the Court turns now to the question of whether Plaintiff is independently entitled to relief based on his *indirect* showing of pretext.

The difficult and novel legal and factual question remaining is whether the Court must determine what the real reason for the job action was before finding that Plaintiff's indirect showing of pretext independently warrants a verdict for Plaintiff. At the close of the evidence, the Court anticipated that it might eventually face this difficult question and requested post-trial briefing from the parties. *See* Court Order of December 15, 1987. Plaintiff conceded (by his lack of a response) under the hypothetical version of the facts posed by the Court, that Plaintiff suffered a legal wrong without a remedy, and instead Plaintiff's counsel later attempted to raise a new state law tort allegation which might conform to the hypothetical version of the facts. Defendant cites language from the *Burdine* decision and argues that Plaintiff must do more than show pretext indirectly. Instead, Church's argues Plaintiff must show that the proffered reason was a *pretext for discriminatory motives*. *See Burdine*, 450 U.S. at 249, 101 S.Ct. at 1091. In addition, Defendant maintains that Plaintiff always bears the ultimate burden of persuading the fact finder that discrimination based on national origin was the reason for the adverse job action, and Plaintiff's inability to make this showing precludes a recovery.

Although Defendant certainly offers a plausible interpretation of *Burdine*, this Court is of the opinion that the decision itself does not require Plaintiff to prove the proffered reason was a pretext for discrimination in the third stage of the case. Put another way, the legal question at issue is whether an indirect showing of pretext alone is sufficient for plaintiff to prevail in the third stage, or whether plaintiff must make a showing of "pretext-plus." Despite the cited language in *Burdine* that Plaintiff must establish pretext *for discrimination*, when the *Burdine* Court explained precisely how Plaintiff can prove pretext, it stated "[he] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated employer or *indirectly by showing that the employer's proffered explanation is unworthy of credence.*" (emphasis added). In this case Plaintiff has clearly established that the employer's proffered explanation is unworthy of credence. Thus under the explicit language of *Burdine*, Plaintiff should prevail.

Two subsequent decisions interpreting *Burdine*, from the Seventh Circuit and the Third Circuit, further bolster this Court's interpretation of what the Plaintiff must show to establish pretext indirectly. In *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 18 (1987), the Seventh Circuit reversed the District Court's granting of a judgment notwithstanding the verdict and affirmed the jury's finding of age discrimination. Immediately after citing the critical language from *Burdine*, the *Grafenhain* court noted:

'The indirect method of proof ... allows victims of age discrimination to prevail without presenting *any* evidence that age was a determining factor in the employer's motivation.' ... Thus, under the three step burden shifting approach, a showing that a proper justification is

pretextual may itself be equivalent that to a finding that the employer intentionally discriminated. In other words, if a plaintiff convinces the trier of fact that it is more likely than not that the employer did not act for its proffered reasons, the employer's decision remains unexplained and the inferences from the evidence produced by the plaintiff may be sufficient to prove the ultimate fact of discriminatory intent. (Citing *Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393 (3d Cir.), *cert. denied*, 469 U.S. 1087 [105 S.Ct. 592, 83 L.Ed.2d 702] (1984)).

In support of its decision, the *Grafenhain* court noted that "a plaintiff employing the indirect method of proof may therefore prevail because the employer fails to advance the real reasons for its employment decision." *Id.* at n. 7. The court went on to cite with approval the recent decision of the Third Circuit Court of Appeals in *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 899 (1987) *cert. denied,* —— U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815. In reaching a similar interpretation of the three step proof approach in an employment discrimination case, the *Chipollini* court stated:

> A defendant which is less than honest in proffering its reason for discharge risks an unnecessary age discrimination verdict ... (T)he *McDonnell Douglas* test is based on the Supreme Court's assumption that 'when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer ... based his decision on an impermissible condition such as (age).' Citing *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 [98 S.Ct. 2943, 2950, 57 L.Ed.2d 957] (1978).

Although the *Chipollini* decision was in the context of determining what evidence was sufficient to preclude summary judgment, this Court finds that the rationale behind both *Chipollini* and *Grafenhein* which allows a plaintiff to prevail upon a showing of simple pretext, rather than a showing of *pretext for discrimination,* is equally applicable to a national origin discrimination case after a full trial on the merits. The *Chipollini–Grafenhein* interpretation of the *Burdine* shifting burdens of production is consistent with the underlying purposes and assumptions of Title VII employment discrimination law. The Supreme Court has recognized that direct evidence of an employer's motivation is extremely difficult to find in an employment discrimination case and there is rarely a "smoking gun" available to plaintiffs. This recognition of the practical realties of employment discrimination led the Supreme Court to adopt the familiar three prong allocation of the burden of proof set forth in *McDonnell Douglas* and *Burdine. See Dillon v. Coles,* 746 F.2d 998, 1003 (3rd Cir.1984). The *Chipollini* court made this argument clear in their reliance on the *Furnco* decision:

> If the plaintiff convinces the trier of fact that it is more likely than not that the employer did not act for its proffered reason, then the employer's decision remains unexplained and the inferences from the evidence produced by the plaintiff may be sufficient to prove the ultimate fact of discriminatory intent in accordance with the *Aikens* standard. '[P]laintiff must be given an opportunity to show that the defendant's stated reasons were in fact only pretextual or incredible.' *Dillon v. Coles,* 746 F.2d at 1003. 814 F.2d at 899.

Defendant relies on the *Burdine* opinion for the proposition that Plaintiff must show the proffered reason is a pretext for discrimination, not merely that Church's has failed to advance the true reason for the discharge. Other language from *Burdine* suggests that once the defendant has come forward with a legitimate non-discriminatory reason for the discharge, any presumption that he acted for discriminatory reasons drops out of the case. Furthermore, once this burden of production has been met in the second stage of the case, the plaintiff still has the ultimate burden of persuading the court that discrimination motivated the adverse job action. *See* 450 U.S. at 253, 257, 101 S.Ct. at 1093, 1095. This argument was clearly articulated by

Judge Hunter in his dissenting opinion in *Chipollini:*

> The majority today shifts the burden of persuasion from the plaintiff to the defendant in clear derogation of controlling precedent. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093 ('The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'). Despite the majority's bland assertion that a 'defendant which is less than honest in proffering its reason for discharge risks an unnecessary age discrimination verdict,' it is the plaintiff who must prove discrimination; the defendant is not required to prove the absence thereof. See *Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam). Yet, by allowing Chipollini to overcome Spencer's motion for summary judgment without introducing any evidence pointing to age discrimination, the majority has effectively and impermissibly shifted the burden of persuasion from Chipollini to Spencer. While the majority does not frankly admit that its decision today will provide such an unwarranted windfall to ADEA plaintiffs, a careful examination of the doctrine shows this to be the case.

> *Burdine* grants the plaintiff the beneficial presumption of discrimination only as long as that presumption remains unrebutted by the defendant. *See Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95. Once the defendant has 'articulate[d] some legitimate, nondiscriminatory reason for the employee's rejection.' *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the initial presumption is 'dispel[led].' *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 678, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978). While the evidence introduced to support the prima facie case continues to have probative force, it no longer carries with it the 'legally mandatory inference of discrimination.' *Burdine,* 450 U.S. at 255 n. 10 [101 S.Ct. at 1095 n. 10]. In considering Spencer's motion for summary judgment in this case, the district court had before it only the facts that constituted Chipollini's initial prima facie case and Chipollini's claim that Spencer's proffered explanations for his dismissal were untrue. Taken together, these facts cannot possibly support the plaintiff's burden of persuasion, unless the majority believes that the plaintiff's initial presumption of discrimination was effectively restored once the plaintiff proved pretext. *See White v. Vathally,* 732 F.2d 1037, 1043 (1st Cir.), *cert. denied,* 469 U.S. 933 [105 S.Ct. 331, 83 L.Ed.2d 267] (1984). There is, however, no Supreme Court authority that would support such a resurrection. 814 F.2d at 903–03.

■ It is important to note that the en banc court of the Third Circuit rejected this well articulated argument by a vote of ten to one. For the reasons outlined earlier, this Court agrees with the Third Circuit that it is proper to allow indirect evidence which rebuts the employer's proffered reason to support a verdict for Plaintiff in the absence of any final showing that discrimination was the real reason for the discharge. Title VII law recognizes that discrimination is widespread in our society and very difficult to prove. The burden of coming forward with a legitimate nondiscriminatory reason for the job action is not a heavy one. The defendant need not prove that he was motivated solely for this reason and his justification will generally not be scrutinized carefully if it relies on a business judgment. *See, generally, Thornbrough, infra,* 760 F.2d at 639 n. 6. In light of these practical realities, this Court believes it is appropriate to resurrect the presumption of discrimination after plaintiff has shown pretext.

This Court does not find resurrection of the presumption of discrimination to be an unwarranted departure from *Burdine.* Since there must be substance to the language in many Supreme Court opinions which requires employers to come forward with *legitimate* nondiscriminatory reasons for discharge, *see, e.g., Aikens,* 460 U.S. at 714, 103 S.Ct. at 1481, *Burdine,* 450 U.S. at

254, 101 S.Ct. at 1094, resurrection of the presumption of discrimination is appropriate. Church's suggested interpretation would read this language out of the Supreme Court opinions. An employer cannot come forward with any reason justifying the job discharge, but must instead come forward with only legitimate reasons. To illustrate the proposition rather starkly, it would seem highly inappropriate to grant judgment for a defendant who came forward and argued that the plaintiff was discharged because the defendant accepted a monetary bribe from an enemy of the plaintiff. When the real reason for discharge is so patently illegitimate, it is proper for the courts to resurrect the presumption that unlawful discrimination motivated the job action. To allow a Title VII defendant to satisfy its rebuttal burden by offering an illegitimate reason for the job action and shifting the burden back to plaintiff would be inconsistent with the evidentiary burdens established by the Supreme Court. Limiting the employer to legitimate reasons makes it possible for the plaintiff to disprove the proffered reason in the third stage of the case. If illegitimate reasons such as nepotism or irrational personal dislike unrelated to job performance were deemed sufficient to rebut the plaintiff's case, the plaintiff would face an impossible task in demonstrating pretext. *Cf.* Schlei & Grossman *Employment Discrimination Law* 306 (Cum.Supp.1987) ("The employer will not shift the burden back to the plaintiff where the articulated reason does not contradict the prima facie case, is too vague, or simply is not legitimate or job-related ... Where an employer fails to meet such a burden [of rebuttal], a reviewing court may conclude that discrimination is established as a matter of law."), *citing, e.g., Gerdom v. Continental Airlines, Inc.,* 692 F.2d 602, 609 (9th Cir.1982), *cert. denied,* 460 U.S. 1074, 103 S.Ct. 1534, 75 L.Ed.2d 954 (1983) (airline's failure to show that weight restrictions for female stewardesses a legitimate nondiscriminatory reason for termination allowed plaintiff to prevail based on her initial prima facie case); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 871 (11th Cir.1985) ("subjective and vague

criteria may be insufficient reasons given by an employer for its failure to rehire because such criteria does not allow a reasonable opportunity for rebuttal"); *Cox v. American Cast Iron Pipe Co.,* 585 F.Supp. 1143 (N.D.Ala.1984), *revd. in part,* 784 F.2d 1546 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 274, 93 L.Ed.2d 250 (employer failed to create issue of fact as to reasons for obstructing female employee's promotional transfer when stated reason was fondness for her). In this case, Church's proffered reason for the discharge—sexual harassment—successfully shifted the burden of production back to Plaintiff. However, once Plaintiff demonstrated that Church's reasons was not worthy of belief, Plaintiff does not have to make the *further* showing that the proffered reason was a pretext for discrimination.

Any doubt left regarding the propriety of resurrecting the presumption of discrimination upon a showing of mere pretext, rather than "pretext-plus" should be resolved by the Fifth Circuit Court of Appeals decision in *Thornbrough v. Colombus and Greenville R. Co.,* 760 F.2d 633, 639–40 (1985):

> ... By articulating legitimate reasons for his decision, the employer rebuts the initial presumption of intentional discrimination created by the plaintiff's prima facie case. The burden of production therefore shifts back to the plaintiff, albeit at 'a new level of specificity,' to prove that the reasons articulated by the employer are not true reasons but only pretexts.... The plaintiff can do this in two ways, 'either [1] directly by persuading the court that a discriminatory reason more likely motivated the employer or [2] indirectly by showing that the employer's proffered explanation is unworthy of credence.' *Burdine,* 450 U.S. at 256, [101 S.Ct. at 1095] *see also Bohrer v. Hanes Corp.,* 715 F.2d 213, 218 (5th Cir.1983), *cert. denied,* ... [465 U.S. 1026] 104 S.Ct. 1284 [79 L.Ed.2d 687] (1984). The first of these alternatives is the alternative that is always open to the plaintiff in an employment discrimination case: producing 'evidence from which a

trier of fact might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.' ... The second, however, depends upon the *resurrection* of the presumption initially created by the plaintiff's prima facie case. By disproving the reasons offered by the employer to rebut the plaintiff's prima facie case, the plaintiff recreates the situation that obtained when the prima facie case was initially established: in the absence of any known reasons for the employer's decision, we presume that the employer was motivated by discriminatory reasons.... Thus, in our view, unlike Humpty–Dumpty, the employee's prima facie case can be put back together again, through proof that the employer's proffered reasons are pretextual. See *Aikens*, 460 U.S. at 718, 103 S.Ct. at 1438 (Blackmun, J., concurring); *Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393, 1396 (3rd Cir.), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592 [83 L.Ed.2d 702] (1984). (Citations omitted) (Emphasis added).

In reaching its decision in *Thornbrough*, the Fifth Circuit relied on *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 718, 103 S.Ct. 1478, 1483, 75 L.Ed.2d 403 (1983). Justice Blackmun, in a concurrence, explained that "the *McDonnell Douglas* framework requires that a plaintiff prevail when at the third stage of a Title VII trial he demonstrates that the legitimate, nondiscriminatory reason given by the employer is in fact not the true reason for the employment decision." The Fifth Circuit adopted this view specifically in *Sylvester v. Callon Energy Serv.*, 724 F.2d 1210, 1213 (5th Cir.1984), where the court wrote "to prevail ... [plaintiff] was required only to prove that the reasons proffered by the company to justify the discharge were pretexts." *cf. Elliott v. Group Medical and Surgical Service*, 714 F.2d 556, 566 (5th Cir.1983) *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984) (evidence of discrimination "may take the form of an attempted showing

that the reason given by the employer, though facially adequate, was untrue as a matter of fact.")

After reviewing all of the evidence, it is clear that Church's reason for suspending and ultimately terminating Jorge Torres—sexual harassment—is completely unworthy of credence. Although it may be argued somewhat plausibly that the sexual harassment was a pretext for something other than intentional discrimination, it is not necessary for Plaintiff to make this further showing.[23] The Court need not engage in fruitless speculation as to whether the shoddily executed and narrowly focused investigation was motivated by reasons of cover-up or job protection rather than intentional discrimination against someone of El Salvadoran national origin. Once Plaintiff has shown that Defendant's proffered reason is unworthy of belief, the case is over. As the Supreme Court observed in *Aikens*, "there will seldom be eyewitness testimony of an employer's mental processes." 460 U.S. at 716, 103 S.Ct. at 1482. This is true in part because discrimination in our society is often subtle. Furthermore, even an employer who knowingly discriminates on an impermissible basis may leave no written tracks revealing the forbidden motive and may have communicated orally to no one. *Chippolini*, 814 F.2d at 899; *LaMontagne v. American Convenience Products*, 750 F.2d 1405, 1410 (7th Cir.1984). Although Plaintiff did provide direct evidence of intentional discrimination through the testimony of Horacio Figueroa, this testimony does not change the legal effect of the indirect evidence of pretext offered by Plaintiff. Under both alternative methods of proof, Plaintiff is entitled to recover.

## 2. Back Pay

42 U.S.C. § 2000e–5(g) authorizes the Court to make an award of back pay once there has been a finding of intentional discrimination. This section further provides that "[i]nterim earnings or amounts earnable with reasonable diligence by the per-

**23.** In this case, Plaintiff has made the further showing of pretext *for discrimination*. However, this finding stands independently. Even

in the absence of direct evidence of intentional discrimination by a preponderance of the evidence, Plaintiff would be entitled to recover.

sons ... discriminated against shall operate to reduce the back pay otherwise allowable."

■ The Court's task then is to determine what Plaintiff would have earned had he continued as an assistant manager at Store # 606 (hypothetical earnings), and deduct from this amount what Plaintiff actually earned during the time period between his suspension and this lawsuit (interim earnings). Plaintiff's uncontroverted testimony at trial was that he earned approximately $500/week in his position as an assistant manager at Church's Fried Chicken. Assuming a 50 week work year, Plaintiff's hypothetical earnings between September 2, 1985 and April 1, 1988 are approximately $55,000.00. After Plaintiff's suspension and termination from Church's, he held a number of replacement jobs. *See* Plaintiff's Exhibit 10. The Court determines that Plaintiff's interim earnings are approximately $30,177.00. Deducting this amount from his hypothetical earnings, the Court finds that Plaintiff is entitled to a back pay award of $24,823.00.

■ Plaintiff admitted under cross-examination that he did receive some unemployment compensation after he was terminated by Defendant. Since Defendant never established how much compensation Plaintiff received and the Court has broad discretion in fashioning an appropriate back pay award, *see, e.g., Merriweather v. Hercules, Inc.*, 631 F.2d 1161, 1168 (5th Cir.1980) (within trial court discretion to deduct unemployment compensation benefits); *Stewart v. General Motors Corp.*, 542 F.2d 445, 452 (7th Cir.1976), the Court declines to make any adjustment to its back pay determination.

■ In addition to the back pay award, Plaintiff is entitled to receive prejudgment interest. *E.g., Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 263 (5th Cir. 1974); *but cf. Merriweather*, 631 F.2d at 1168 (within discretion of district court to refuse to award interest). The trial court has considerable discretion in determining an appropriate method for calculating prejudgment interest. Schlei & Grossman, *supra*, at 352 n. 84 (Cum.Supp.1987). In this

case, the Court determines that the T-bill rate used by the Administrative Office of the U.S. Courts between September 1985 and February 1988 is an appropriate baseline for the calculation of interest. This rate is approximately 7%. Accordingly, Plaintiff is entitled to an additional award of $1,738.00.

### 3. Reinstatement

■ A finding of intentional discrimination presumptively entitles the prevailing plaintiff to an award of back pay and retroactive reinstatement unless the defendant can prove by clear and convincing evidence that plaintiff would not have stayed in his job absent the discrimination. *See* C. Richey, *supra*, at A–55, *citing, e.g., Albermarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Franks v. Bowman Transportation Co.*, 495 F.2d 398 (5th Cir.1974) *rev'd on other grounds*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). Defendant has presented no evidence in this case that Jorge Torres is not entitled to back pay and reinstatement.

One difficulty in fashioning appropriate reinstatement relief is that the Court must be concerned that its equitable relief does not displace innocent employees. In *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 579, 104 S.Ct. 2576, 2588, 81 L.Ed.2d 483 (1984), the Supreme Court stated that a prevailing plaintiff was not automatically entitled to have a nonminority employee laid off to make room for him. The Supreme Court advised trial courts to "balance the equities" in fashioning a remedy and noted that the plaintiff may have to wait until a vacancy occurs. In such a situation it is appropriate to award "front pay" until a position becomes available. *E.g., Thompson v. Sawyer*, 678 F.2d 257 (D.C.Cir.1982); *Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 957 (10th Cir.1980). In some circumstances the environment may be so hostile for the prevailing plaintiff that the Court may determine reinstatement to be inappropriate. *Id.* In this case, however, Plaintiff has testified that despite his unfair treatment, he wishes

to work again as an assistant manager for Church's at their downtown location.

It is therefore ORDERED that Defendant reinstate Plaintiff in the first available assistant manager vacancy which occurs in the San Antonio area. It is FURTHER ORDERED that once an assistant manager position opens at the downtown location that Plaintiff be transferred to that position. In the interim between judgment and Plaintiff's reinstatement to his former position, Defendant will continue to award Plaintiff "front pay," in the amount of the differential between the assistant manager's total compensation at Store # 606 and Plaintiff's current job at Alfonso's or a different assistant manager's position at Church's. Finally, it is ORDERED that until Defendant places Mr. Torres in an assistant manager position that he continue to mitigate his damages by maintaining his current employment at Alfonso's. Should the parties desire to modify this remedy, they may petition the Court.

## C. *Retaliation Under 42 U.S.C. § 2000e–3*

█ In the Pretrial Order Plaintiff Torres claimed that he was terminated by Defendant Church's "because other employees of Church's had filed charges with Equal Employment Opportunity Commission and because Jorge Torres had filed a Charge with Equal Employment Opportunity Commission, in violation of ... § 2000e–3." At the close of Plaintiff's case upon Defendant's Rule 41(b) motion for dismissal, Plaintiff agreed to abandon his retaliation claim and proceed only with his national origin discrimination claim and his state law implied contract claim.

On December 28, 1987, after the conclusion of trial and in response to the Court's order of December 15th requesting additional briefing on several legal issues, Plaintiff made the rather extraordinary plea to reopen the retaliation claim. As grounds for this 13th hour appeal, Plaintiff asserts: "Although discovery had revealed little retaliation evidence, Torres asserted that cause of action as he proceeded to trial in the Pretrial Order.[24] Mr. Gerald Bailey, Church's personnel director, also professed in his April 21, 1986 deposition, an almost total ignorance of the facts in this case, preferring to lodge responsibility for the actions against Torres on the area director, Marcial Leal. Indeed Bailey continued to refer to his knowledge throughout the course of his deposition as coming from Church's attorney, Mr. Laurence Macon, the newspaper, or from other personnel at Church's."

Although Plaintiff's legal theory is never made explicit, and the sole authority cited, *Goza v. Bolger,* 538 F.Supp. 1012 (N.D.Ga. 1982), is of no relevance in the Court's view, the Court interprets Plaintiff's plea as some sort of an estoppel argument. Apparently Plaintiff believes that he can avoid his waiver of the retaliation claim at the close of his case because it was based on

---

**24.** Defendant has argued all along that the national origin claim should be dismissed for Plaintiff's failure to properly plead it in the Pretrial Order. Plaintiff continues to assert in this December 28th pleading that the national origin claim was properly before the Court: "It will be recalled that the [sic] Torres asserted in his Pretrial Order several versions of violations of Title VII ... Because of the rapid nature of the retaliatory action taken toward Torres in an effort to cover-up the conduct of his superiors, Torres asserted in this lawsuit two Title VII theories of liability, including national origin discrimination and retaliation ..." Response to Order of Court at 1–2. The Court agrees with Defendant that the Pretrial Order, which is the final version of Plaintiff's claims, contains no reference whatsoever to national origin discrimination. Given Plaintiff's counsel's judgment that the national origin discrimination claim

was the far stronger Title VII claim, his failure to mention this claim in the Pretrial Order is even more difficult to comprehend or excuse. Notwithstanding this omission by counsel, the Court decided to allow Plaintiff to proceed with his national origin claim.

Gerald Bailey testified at trial that he did not know when or how Mr. Torres's personnel file was lost. Although the loss of the file may appear suspicious, the Court is unwilling to engage in any speculation that Defendants conspired to conceal evidence, notwithstanding Plaintiff's post-trial assertion that "Church's conspiracy was so effective in its secrecy that Torres had no reason to even charge retaliation before the EEOC." Response to Order of Court at 3. Furthermore, Plaintiff has not notified the Court of any discovery request for Mr. Torres's personnel file during the course of this litigation.

Defendant's knowing concealment of facts material to the claim.

Were the underlying facts supportive of Plaintiff's argument, it would have some appeal. However, after fully reviewing the deposition testimony of Mr. Bailey, the evidence adduced at trial, and the history of this case, the Court finds that Plaintiff should not be allowed to waive his abandonment of the retaliation claim. It is undeniable that Mr. Bailey offered some very surprising testimony at the conclusion of the trial which could plausibly support a retaliation claim. The Court need not review this testimony or Defendant's creative attempts to explain it in reaching its decision not to reopen the case, however. The essence of Plaintiff's retaliation claim is that Church's decided to terminate him after his sixty day suspension because he had filed a claim of discrimination with the EEOC. Mr. Bailey's testimony at trial concerning why and when Mr. Torres was eventually terminated was extremely convoluted. At one point Mr. Bailey did seem to say that Mr. Torres could not be rehired because the EEOC claim remained pending. At another point Mr. Bailey suggested that Mr. Torres was terminated because he was "dropped" by the computer system after no work time had been logged for a certain period. Another possible interpretation of Mr. Bailey's opaque trial testimony is that Church's decided to terminate Mr. Torres because no new evidence exonerated him of the sexual harassment allegations.

Mr. Bailey's deposition testimony does not show that he knowingly concealed information regarding the circumstances of Mr. Torres's final termination. At page 56 of the deposition, Bailey said that he assumed Plaintiff had been terminated, but that he would have to review the "disciplinary action form" to ascertain the reason and date of the official termination. Plaintiff has not brought to the Court's attention any subsequent discovery requests for the disciplinary action form, nor has Plaintiff indicated that the form is part of the "lost" personnel file. In addition, notwithstanding Mr. Bailey's professed ignorance of the circumstances surrounding Plaintiff's official termination at the time of the

April 1986 deposition, Bailey did provide some testimony which might at least lend some circumstantial support to the retaliation claim. At page 66 of his deposition, Mr. Bailey agreed with a question from Plaintiff's prior counsel, Mr. Patrick Stolmeier, that Church's could not help him anymore in defending the allegations of sexual harassment because of his filing of an EEOC claim. Although the Court doubts that an employer's decision to withhold help in defending a suspended employee because he had filed an EEOC claim would establish a retaliation claim by itself, Plaintiff's attorney should at least have drawn the inference that Church's may have taken some action against Mr. Torres after he filed the claim with the EEOC. Accordingly the Court concludes that Mr. Bailey's deposition testimony, when taken as a whole, does not constitute a knowing concealment.

This Court is unwilling to assume that the inconsistency (of omission) between Mr. Bailey's trial testimony and his deposition testimony was the result of knowing concealment. It is just as likely that Plaintiff is at least partially responsible for any surprise he suffered at trial because of his failure to conscientiously pursue discovery or that Mr. Bailey's ignorance at the time of the deposition was genuine and his knowledge had been supplemented in the interim between deposition and trial by the disciplinary action form or other sources of information.

The Court is inclined to deny Plaintiff's attempt to reopen the case for a second independent reason. In deciding to abandon the retaliation claim at the close of his case, Plaintiff's counsel apparently overlooked some trial evidence which may have supported the claim. Plaintiff himself testified that sixty days after his suspension he went to Church's Divisional Office and had an angry confrontation with Jerry Bailey and Marcial Leal. Plaintiff testified that Mr. Bailey yelled at him, called him a dog, told Torres he would have to go to the EEOC for further help and that he was still suspended until his case was "cleared." This testimony, if believed, would certainly

support an inference that Church's may have taken some action against Jorge Torres as a result of his filing the EEOC claim. Given this circumstantial evidence and Mr. Bailey's somewhat equivocal deposition testimony, it cannot be said that Defendant's knowing concealment of the reason for Mr. Torres's termination *caused* him to unwittingly abandon his retaliation claim at the close of his case. Absent such causation, the Court finds it would be highly inappropriate to give Plaintiff a second bite at the apple. Finally, the Court notes that any relief it might be inclined to grant on the retaliation claim would be duplicative insofar as the Court has decided that Mr. Torres is entitled to back pay and reinstatement for national origin discrimination. For all the foregoing reasons, Plaintiff's request to reopen the evidence to fully test his retaliation claim is DENIED.

In summary, the Court finds that Defendant Church's Fried Chicken, Inc., is liable to Plaintiff Jorge Torres on his claim of national origin discrimination for the sum of $24,823.00 plus interest. The Court further finds that Plaintiff Jorge Torres is entitled to front pay and reinstatement to his former position as outlined in this opinion and in the separate order of judgment. All other claims raised by Plaintiff Torres against all other defendants are DISMISSED WITH PREJUDICE.

On the claims of Plaintiff Belinda Valdez, the Court finds that Defendant Jerry Estrada is liable to Plaintiff Valdez on her state law assault claim for the sum of $46,525.00 plus interest as outlined in this opinion and in the separate order of judgment. All other claims raised by Plaintiff Belinda Valdez against all other defendants are DISMISSED WITH PREJUDICE.